Craig *v.* Craig.

---

CRAIG and STRONG, executors, &c. *vs.* CRAIG and others.

Where a testator, desiring to make a certain provision for his son, which would give him a sure and ample support during his life, by his will directed his executors to invest in bonds and mortgages, and in New-York state stocks, a sum of money sufficient to produce, *in legal interest,* at least $500 per annum, to be held by such executors in trust for the legatee, and such income to be used by them, in his support and maintenance; such investment to be made, as near as conveniently might be, in equal sums, in bonds and mortgages, and in New-York state stocks; *Held* that the investment should be so made, by the executors, as to raise the full sum of $500 annually; that the testator did not intend that his executors should invest a capital which, at seven per cent interest, would produce $500 annually, but an amount sufficient to produce at least $500, in legal interest or income, at the rates at which such capital could be kept invested during the probable continuance of the life of his son; and that in making the investments upon bonds and mortgages the executors were authorized to invest such a sum as would, at six per cent, produce $250 annually.

*Held also,* that as to the other half of the investment, directed to be made in public stocks of the state, the executors had no discretion, so long as there were any such stocks to be purchased at par, whatever might be the annual income therefrom; and that in making the first investment, the executors were authorized to purchase, above par, five per cent stock enough to produce an income of $250, annually, if they could not get it at par. But that after having once made such investment in stocks, the executors would not be authorized to diminish the capital of the fund invested, by purchasing other stock at a rate beyond its par value, in case the first stock should be paid off.

Trusts for accumulation, being prohibited by statute, except for the benefit of minors, a trust to accumulate the rents and profits of real estate, or the interest or income of personal estate, cannot be created for the benefit of a lunatic who is not a minor. But where an annuity is given absolutely to a lunatic, a court of equity may direct the surplus, beyond what is necessary for his support, to be paid over to his committee, and invested for his use.

Where the income of a lunatic is more than can be properly expended for his use, it must, as a matter of necessity, be accumulated for him, or for those who may

Craig *v.* Craig.

eventually be entitled to his property, as his next of kin. But that is not a trust for accumulation which is prohibited by the statute.

Where there is a limitation over, not only of the capital of a fund directed to be invested for the purpose of paying an annuity for life, but of so much of the proceeds thereof as shall remain at the decease of the annuitant, there is an implied direction to accumulate the surplus income of the capital, by the executors, in trust for adults, or for persons not *in esse* at the time the accumulation is directed to commence; which direction to accumulate is void by the provisions of the revised statutes.

Where there is a devise of the income and avails of property to a person, for life, without any devise or bequest to the executors as trustees of such property, the legatee will take a legal estate in such property, if there is nothing else in the will to show that the testator intended to create a valid trust of the estate for his benefit. For a devise of the rents and profits of land for life, without any thing more, is but another mode of making a devise of the land itself, during the same period.

But where the will clearly shows that the testator intended a legatee should receive the rents and profits of the real estate embraced in one share of his property, as well as the income of the personal estate included therein, through the medium of his executors, the executors take the legal title to that share of the real estate during the continuance of the beneficial interest of the legatee therein, as trustees, by implication; to enable them to rent the premises, and to receive the rents and profits thereof, and pay them over to the legatee, or apply them to his use.

Where a testator, by his will, gives no authority to his executors to sell his real estate, the executors cannot sell any portion thereof, either for the purposes of division or otherwise.

But where an express power in trust is given to executors to divide a specified part of the real and personal estate of the testator into four equal parts, and to invest two of the shares for the benefit of two of his children, this is a valid and imperative power in trust, under the provisions of the revised statutes, to divide such real estate into four equal parts, by a valid and legal instrument setting off the share of each devisee in severalty, under the will.

Where a portion of the trusts of a will can be so far severed from the general trust committed to the executors, as to be capable of being vested in different persons, the court, upon sufficient cause shown, and on the giving of proper security to protect the rights of the *cestuis que trust*, may accept the resignation of the trustees appointed by the will, as to those particular trusts, and appoint others in their places.

A residuary devise of real or personal estate, carries with it not only the property of the testator in which no interest is devised or bequeathed by other parts of the will, but also all reversionary and contingent interests in the property, which, in events contemplated by the testator, are not otherwise disposed of.

Where trustees under a will have accepted the trust and have received a legacy given upon the condition that they should execute such trust, the court will not discharge them from the trust without good and sufficient cause be shown.

Craig *v.* Craig.

Where an annuity is given by a will, and there is no direction as to the time when it shall commence, it commences at the testator's death.

Where stocks are conveyed to the husband and his wife jointly, and she outlives her husband, who dies without having disposed of the stocks, the wife takes the who by survivorship.

An absolute delivery, and a continued change of possession, are essential requisites of a good *donatio mortis causa.*

The promissory note of the donor is not a good gift *inter vivos;* and the donor, or his representatives, may impeach such a note for want of consideration.

The promissory note of the donor is not a valid gift *mortis causa.*

But *it seems* that the draft of the donor, in favor of another, may operate as an appointment, or appropriation, of the fund upon which it is drawn, to the use of the donee.

*Wright* v. *Wright,* (1 *Cowen,* 598,) commented upon, and overruled.

The case of *James* v. *James,* (4 *Paige,* 117,) commented on, and explained.

THE bill in this cause was filed by the executors of Archibald Craig, deceased, to obtain a judicial construction of the will of their testator, in various particulars; and for directions as to the manner of investing and distributing his estate, under the provisions of the will. The testator made his will in June, 1845, and died about a year afterwards, leaving a second wife surviving him. He also left one daughter by his first wife, and three sons and one daughter by his last wife, his only heirs. At the time of making the will, and at his death, his oldest son and his two daughters were married, and his second son was a lunatic. He owned a large estate, consisting of real and personal property; and there was also stock standing in the joint names of himself and wife, which she claimed as her separate property, and she had also real estate which had been conveyed to a trustee for her use.

By his will, after making provision for the payment of his debts, and giving some small legacies to collateral relatives, the testator disposed of the residue of his estate as follows:

"*Fifth.* It being my desire that a certain provision be made for my son John (the lunatic,) which will, give him a sure and ample support during his life, I therefore order and direct that my executors, before any distribution of my estate be made, invest in bonds and mortgages, and in New-York state stocks, a sum of money sufficient to produce, *in legal interest,* at least

Craig v. Craig.

five hundred dollars per annum, to be held by my executors in trust for my said son John; which income, or so much thereof as may be necessary, I direct to be used by my executors, and the survivor or survivors of them, in his support and mainte- nance. Such investment I direct to be made, as near as con- veniently may be, in equal sums, in bonds and mortgages and in New-York state stocks; the bonds and mortgages to be taken on unincumbered productive real estate within this state, worth, exclusive of buildings thereon, at least double the sum so in- vested. The principal so invested, or so much thereof and of the proceeds thereof as may remain, at the decease of my said son, unexpended, I give, devise and bequeath to the legal issue of my said son; and in case he leaves no issue, then I give, de- vise and bequeath the same to my four children, James R. Craig, La Rue Craig, Elizabeth C. wife of Julius Rhoades, and Gertrude, wife of John T. Hudson, and to their respective heirs and assigns forever, share and share alike.

*Sixth.* I give, devise and bequeath to my wife, Anna Maria Craig, the use and occupation of my present dwelling house, lot and premises connected therewith, in the city of Schenec- tady, together with all and singular the out-buildings and ap- purtenances thereunto belonging, during her natural life. I also give to her an annuity of $1600 per year, to be paid to her in semi-annual payments; the principal of such annuity to be in- vested in such manner as she may reasonably require. I also give to her my family coach or carriage, my two-horse pleasure sleigh, and such carriage horses, harness, and other carriage appendages as I may die possessed of, and all my household furniture. The several devises and bequests unto my said wife are given for her use, in lieu of any right of dower and other claim which she may have upon any part of my estate, and to take effect upon her executing to my executors a release of her right of dower or other claim, when requested so to do by the persons interested therein.

*Seventh.* My son James R. Craig, having for several years past occupied and improved that portion of my real estate which is situated at and near the aqueduct, containing between three

and four hundred acres of land, and being desirous that he should receive the title to those lands upon terms which I deem reasonable and just, I hereby give, devise and bequeath into him in fee the lands aforesaid, upon condition, however, that he shall pay, in consideration thereof, to my executors, for the same, $6000, within five years after my decease, without interest; which sum, when paid, to be regarded as part of my estate, and to be equally divided between my children, Elizabeth, Gertrude, James R. and La Rue, or to their legal representatives. It being expressly understood that my said son James is to make no charge against me or my estate, for any services rendered or any expenditure made on the said lands; nor is he to be charged any rent for the use and occupation of the same.

*Eighth.* I order and direct that my executors, in taking an inventory of the rest and residue of my estate real and personal, not herein before devised, bequeathed and disposed of, shall charge my son James R. with the sum of $9000, my daughter Elizabeth with the sum of $8000, my daughter Gertrude with $6000, and my son La Rue with the sum of $6000, each being the amounts, as nearly as I can ascertain the same, which I have already advanced to them respectively; and that the aggregate of such real and personal property be divided into four equal shares.

*Ninth.* I give, devise, and bequeath one of those equal shares or parts lastly above mentioned to my son James R. Craig, and to his heirs and assigns forever; but the sum of $9000, advanced to him, is first to be deducted from his said share or part, before any payment is made to him, and my estate credited for that sum.

*Tenth.* I give, devise, and bequeath one other of those equal shares or parts to my son La Rue Craig, in fee; but the sum of $6000, advanced to him, is first to be deducted from his said share, before any payment is made to him, and my estate credited with that sum.

*Eleventh.* I give and bequeath to my daughter Gertrude, wife of John T. Hudson, the *income and avails* of one other

of the said equal shares or parts before mentioned; the said avails and income to be paid to her, by my executors, *annually*, during her natural life; and upon her death, I give, devise, and bequeath such equal share or part to the heirs at law of the said Gertrude, and to their heirs and assigns forever; but the $6000, so advanced to her, is to be deducted from such share, before any payments are made thereon, and my estate credited with that sum.

*Twelfth.* I give, devise, and bequeath to my daughter Elizabeth, wife of J. Rhoades, the remaining equal share or part before mentioned; the *avails and income* to be paid to the said Elizabeth, by my executors, during her natural life; and upon her death, I give, devise, and bequeath such equal share or part to the heirs at law of the said Elizabeth, and to their heirs and assigns forever; but the $8000, so advanced to her, is to be deducted from such share, before any payments are made thereon, and my estate credited with that sum.

*Thirteenth.* It is my wish, and I so order and direct, that the portion of my estate mentioned in the eighth article of this instrument be divided as soon as the same conveniently can be, and the shares of my sons James and La Rue be delivered to them respectively, and the shares of my daughters be invested for their benefit respectively, by my executors; but before effecting this division, it is my desire that my executors sell my lot of ground, situate on the corner of Main and Tupper-streets in the city of Buffalo, and also the lot called the Mill pasture and canal stable in the city of Schenectady; and for that purpose, they are hereby empowered to execute the necessary title deeds to convey the same to purchasers.

*Fourteenth.* It is my wish, and I so order and direct, that my four children, James R., La Rue, Elizabeth and Gertrude, and their respective heirs, shall at all times share equally in the division of all the property which I own in my own right, as well as the property the fee and title of which is in my wife; but being advised, that in case my said wife, at her decease, should leave the property, the fee of which is in her, undisposed of, that the title to the same would pass to her children. exclu

---
Craig *v.* Craig.
---

ding my daughter Elizabeth : with the view, therefore, of equalizing such property, in every contingency, among my four children, James R., La Rue, Elizabeth and Gertrude ; and in case my said wife, in her lifetime, shall fail to give, devise, or divide such property, the title of which is in her, in equal shares or portions to and among such four children, then, and in such case, I give, devise and bequeath the real estate before devised for life to my said wife, and also the principal of the said annuity of $1600 so invested for my said wife, to my executors, in trust, for the benefit of my said children or child as may not receive an equal share of said estate of my wife, so far as to make such child or children equal to the largest share that may be received by either of them from the estate of my said wife ; and that the residue, after such equalization, be divided equally between such four children and their legal representatives, share and share alike ; it being the express intention of this instrument to make the shares of the said Elizabeth, James, La Rue and Gertrude, in the estate left by me, and in the property so owned by my said wife, in all respects equal.

*Fifteenth.* It being my wish and desire that my son John Craig should be amply provided for, I hereby order and direct, that in case my said son should recover, and become of sound mind and capable of taking care of himself, my other children shall each pay over to him, out of the shares of my property bequeathed to them respectively in and by this instrument, the sum of $2000, making $8000 in all ; this sum to be given to him in addition to the annuity of $500 hereinbefore bequeathed to him."

The testator appointed his wife executrix, and the complainants James R. Craig and John Strong the executors of his will ; and gave to Strong a legacy of $500, in addition to legal commissions, upon condition that he accepted and executed the trust of executor. The executrix renounced the trust ; but the executors proved the will, and took out letters testamentary thereon. And the widow elected to take the provision made for her by the will, in lieu of dower and other claims upon the estate of the testator, and released her right of dower, in con-

Craig *v.* Craig.

formity with the directions of the will on that subject. At the time of filing the complainants' bill, Mrs. Rhoades had two children and Mrs. Hudson one, who were made defendants; and who, being minors, appeared and put in answers by their guardians *ad litem.* John Craig, the lunatic, also appeared by his guardian *ad litem,* and put in a general answer. The cause was heard upon bill and answer as to the adult defendants; and upon the bill, answer and master's report, as to the minors. And at the hearing, J. Rhoades and wife, John T. Hudson and wife, James R. Craig and La Rue Craig entered into a written stipulation, authorizing the executors to retain $2000 from the share of each of the children of the testator, except John, before a division between them under the eighth and ninth clauses of the will, and to invest the same in such manner as the court should from time to time direct, to provide for the contingency of the recovery of John Craig as contemplated by the testator in the fifteenth clause of his will.

*A. C. Paige,* for the complainants, the executors, for Mrs. Craig the widow of the testator, and for La Rue Craig. The complainants ask for a judicial construction and decision upon the parts and particulars of the will of the testator, specified in their bill of complaint; and also upon such other parts of said will as may appear to be doubtful or obscure; and they ask for such directions in respect to the execution of the said will, and particularly in reference to the doubtful, obscure, or ambiguous parts thereof, as may be necessary to guide and protect them in the discharge of their duty. The complainants also ask for a decision of the question whether the acts of the testator, stated in the bill, constituted a reduction to possession of the stocks and personal property of Mrs. Craig, so as to make the same parts of the testator's personal estate. The complainants ask especially for the decision of the questions stated in the seventh particular of the bill, and particularly whether they can make a division of the residue of the testator's real and personal estate, as directed by the 8th and 13th clauses of the will, as executors or as trustees; or whether

the same can be made before Mrs. Craig shall have given or devised her property among the four children of the testator; or if made before, whether such division will be absolute or contingent on Mrs. Craig's compliance with the 14th clause of the will; and if such division will be contingent, whether the income of the shares of Mrs. Hudson and of Mrs. Rhoades is to be applied as directed in the 11th and 12th clauses of the will, until it be ascertained whether the disposition specified in the 14th clause has been made. The complainants especially submit the question, for the decision of the chancellor, whether a valid trust is created by the will to receive the income of two fourths of the residue of the real and personal estate of the testator, and to apply the same to the use of Mrs. Rhoades and of Mrs. Hudson respectively during their lives. And if no valid trust is created by said will, and if there is a failure to dispose of the two-fourth parts of the residue of said estate, intended for Mrs. Rhoades and Mrs. Hudson, how such failure affects the other provisions of the will. The complainants also especially ask for the decision of the question, whether they are authorized to sell any part of the real estate, other than that mentioned in the 13th clause of the will, for the purpose of dividing the proceeds of the sale between the four children; or whether they are authorized to lease such real estate, or to receive the rents thereof and to pay the same over to the said four children. The complainants also ask the chancellor to decide whether they are appointed trustees, by said will, of the shares of the testator's estate devised to Mrs. Rhoades and to Mrs. Hudson, and to their heirs. And if it shall be decided that they are trustees of such shares, then they ask permission to resign such trust. The complainants also ask for a decision whether they are authorized by the will, in making the division directed by the will, to divide any part of the real estate among the four children. And they ask for all necessary directions as to the division of the said residue of the real and personal estate among the devisees and legatees, or as to the sale of the same, or of any part thereof, and the division of the proceeds thereof among such devisees and legatees; and generally, that all

such other directions may be given as the circumstances of this case may require; and that the accounts of the complainants as executors may at all proper times be taken and passed under the order of this court.

*J. C. Spencer*, for J. Rhoades and wife, and for J. T. Hudson and wife. It was the intent of the testator that five hundred dollars *absolutely*, should be raised annually for the support of his son John. The executors should invest in five per cent state stock, enough to produce two hundred and fifty dollars annually. The devisees are not bound to supply any deficiency in the fund, if there should be any. The executors may reserve the surplus of one year for the accidents of another, and are to invest it. No part of any excess during a year should be distributed during the life of John. The principal sum invested to produce the annuity for John, is disposed of by the 5th clause of the will, and is not subject to division under the 8th clause, and is not affected by the 11th and 12th clauses. We suppose all the land which the testator had used as *premises* connected with the lot, passed to Mrs. Craig, and all the outbuildings. Mrs. Craig is to direct in what securities the investment for her is to be made; and the fund will be at her risk. The shares of the $6000 to be paid by James R. Craig, are given absolutely to the four children of the testator, and form no part of "the residue" referred to in the 8th clause, and are not subject to the 11th and 12th clauses, but should be paid over at once to all the legatees. The remainder in fee in the premises devised to Mrs. Craig for life, and in the principal sum invested for her annuity, is devised by the 8th clause to the four children. The property is to be divided by the executors as such. This is a *mere power*. All the property, excepting the principal of John's annuity, the $6000 to be paid by James R. Craig, and that devised to Mrs. Craig, or invested for her, is to be *immediately* divided. The property devised to Mrs. Craig, and invested for her, is to be divided upon her death, by the executors, according to the 14th clause. By the devise of the avails and income of one fourth of the real estate to Mrs

Rhoades and Mrs. Hudson, an absolute estate is vested in them for life, in the lands. The income of the personal estate is to be paid over to Mrs. Rhoades and Mrs. Hudson by the executors, as such ; and they have no estate as *trustees*. In case of death, resignation, &c. the duty is to be performed by the administrator with the will annexed ; and the personal estate is to be invested by them as *executors*. The avails and income thus devised, are not separate estates for the wives, but interests which the husbands may reduce to possession. But the husbands offer and agree that the decree be entered to pay over on the receipts of the wives. Mrs. Rhoades and Mrs. Hudson take only life interests. The fee is expressly devised over. The executors have no power to sell the real estate, unless it is necessary for the purpose of division. The charge of $2000, in the event of John's recovery, is upon the devisees *personally*, and not upon the real estate devised. No deduction should be made in the division of it on that account; nor should any thing be retained by the executors for the purpose of paying that charge. No security is necessary or required by the will to be given by the devisees. But if John should be in the same situation when the tenants for life die, the court will probably direct sufficient to be retained by the executors ; instead of paying it to the devisees in fee.

*A. L. Linn*, for John Craig, the lunatic legatee. The two clauses in the will of the testator which regard the defendant John Craig, to wit, the fifth and fifteenth, are founded upon the express wish of the testator, not only to "*give him a sure and ample support during his life*," but with the manifest intention of making provision for him in the event of his having legal issue, or becoming of sound mind. And as the only reason appearing on the face of the will, why the testator withheld from this son his full share of the estate is his *unsoundness of mind*, and as the provisions made for him in any event fall far short of his full share, they ought not to be burthened with limitations and restrictions, but should be benignly and liberally construed in his behalf. The provision made for this

Craig *v.* Craig.

defendant, by the 5th clause of the will, entitles him to have invested, before any distribution of the estate of the testator, a sum sufficient to produce in legal interest at least $500 per annum. This defendant is entitled to have this investment made, in the language of the will, "*as near as conveniently may be in equal sums in bonds and mortgages and in New-York state stocks;*" that both as it respects the security of the investment and the interest therein, to which his *legal issue*, should he have any, will be entitled, this direction of the will should be observed so far as practicable. The trust created in favor of this defendant by the 5th clause of the will was intended, by the testator, to secure to the use of this defendant not only the annual sum of $500, but such annual sum to grow out of the particular funds specified. And no obscurity occurs from the use of the words *legal interest ;* nor can they in any event reduce the annual income of $500, to which this defendant is entitled. These words *legal interest* regard the rate of interest, which both the state stocks and bonds and mortgages, procured for the purposes of such investment, shall legally bear—the stocks by the law of the state which created them—the bonds and mortgages by the contract between the executors and mortgagor. The trust created in favor of this defendant, by the 5th clause of the will, was intended to secure to him absolutely the annual sum of $500 ; whether such sum be necessary for his support and maintenance or not. And the principal out of which such annuity is to grow, as well as all increases in value of such principal, and surpluses of the income thereof, and the accumulations thereof arising from the investment of such surpluses, if any, is a fund sacred to the uses of this defendant and his legal issue, if any, who shall him survive. It will become the duty of the executors, as the trustees of the fund directed, to be created for this defendant, to invest from time to time, such portion of the annual proceeds thereof as shall not be applied to the support and maintenance of this defendant. As to the mode in which the provision made for the defendant by the 15th clause of the will, whereby, in the event of his becoming of sound mind, the sum of $8000 is to be paid to him by the

Craig v. Craig.

other children of the testator, shall be secured, his guardian submits to the direction of the court. It is insisted, however, that whatever may be the construction given to the bequest, made in the will, to the complainant James R. Craig and the defendant La Rue Craig, or to the trusts created for the benefit of the defendants Elizabeth C. Rhoades and Gertrude Hudson, the sum directed to be paid to this defendant by the 15th clause should either be withheld from division and distribution, among those entitled in case the event contemplated in said clause shall not happen, or before such division and distribution it should be properly secured to this defendant.

*J. V. L. Pruyn*, for the children of Mrs. Rhoades, and of Mrs. Hudson. The will creates, if not in terms, then clearly by implication, a valid trust estate in one of the shares of the testator's residuary estate, for the benefit of his daughter Mrs. Rhoades, and her heirs at law. The intention of the testator to preserve the capital of this part of his estate and to give to Mrs. Rhoades the benefit of the income only, with remainder to her heirs at law, is distinctly declared in the 12th and 13th sections of the will. And no ambiguous or doubtful language used in other parts thereof, will be permitted to overrule the testator's clearly expressed views on this point. It is manifestly to be implied from the will, that the executors are to act as trustees for the fund. They are, at any rate, to act as such so far as the personal estate is concerned. Under the 8th section, they have power to divide the estate. In the 12th section, they are directed to pay the income and avails of the share to Mrs. Rhoades, and by the 13th section they are to invest the share. But if the court should be of opinion that the executors were not constituted trustees by the testator, it will not permit his intentions to fail, but will appoint trustees to execute the trust. If, however, the share of the estate referred to was not devised in trust, then a valid power in trust is vested in the executors, under the will, in favor of the heirs at law of Mrs. Rhoades, which this court will require them to execute. Or, if no such power exists

Craig v. Craig.

under the will, then its provisions, in regard to the said share, contain valid directions for the disposition of the same, which the court will require the executors to carry into effect on their part. By these directions, if they are such, a life estate vests in Mrs. Rhoades in one of the residuary shares, with remainder to her heirs at law. In case the court shall be of opinion that under the will Mrs. Rhoades took an absolute estate in the one fourth part of the testator's residuary estate, then, under the offer in the answer of Mr. and Mrs. Rhoades, a proper settlement of her share of the estate should be made, under the direction of the court, so as to protect and preserve the capital thereof for the benefit of her children and heirs at law, as originally contemplated by the testator. The capital of the fund which may be set apart to secure the annuity to John Craig and the amount of $6000 to be paid by James R. Craig under the 6th section of the will, and also the amount to be set apart to secure the annuity to Mrs. Craig, and the house and lot in Schenectady devised to her for life, subject to the execution of the power as to the two latter, contained in the 14th clause of the will, on the happening of the contingency therein mentioned, form part of the residuary estate of the testator disposed of in the 8th section of the will, and the one fourth part of which was devised in trust as aforesaid, for the benefit of Mrs. Rhoades and her heirs at law.

THE CHANCELLOR. The first question upon which the court is asked to give a judicial construction of the will in this case, is as to the investment for the purpose of raising an income for the support of the lunatic son of the testator. In this question the children of Mrs. Rhoades and Mrs. Hudson, as well as their parents and the lunatic, have an interest. For the capital of this investment is carved out of the general residuary estate of the testator, in which residuary estate the interests of the parties will be different from what they are in the capital of the fund thus carved out of the same. For in the general residuary estate Mrs. Rhoades and Mrs. Hudson have but life interests; and the remainder in fee is limited to their

heirs at law.  But the capital of the fund which is to produce the annuity for the support of the lunatic, is given absolutely o his brothers and sisters, in case he dies without leaving issue, and the heirs at law of Mrs. Rhoades and Mrs. Hudson have no interest therein as remaindermen.  The investment must therefore be made so that no injustice shall be done as between the ultimate owners of the general residuary estate or interests therein and the ultimate owners of the capital of this particular fund.  But the rights of the lunatic, under the will, must at the same time be preserved.  And I think his guardian *ad litem* is right in supposing that the investment must be so made as to raise the full sum of $500, annually.  The testator, as a man of business, well knew that state stocks bearing an interest of seven per cent and having any considerable time to run, could not be purchased at par.  He also knew that permanent investments upon bonds and mortgages, on such property as he directed these investments to be made in, could not be made to produce a clear and permanent interest of seven per cent.  And yet he uses language, not only in the fifth but also in the fifteenth clauses of his will, showing clearly his intent to leave an undiminished income of $500, annually, for the support of his unfortunate child.  He did not, therefore, intend that his executors should invest a capital which, at seven per cent interest, would produce $500 annually; but an amount sufficient to produce at least $500 in legal interest or income, at the rates at which such capital could be kept invested during the probable continuance of the life of his son.  The expression "at least $500," shows that he intended to allow his executors a proper discretion in this respect; so that the income of $500 should not be diminished in any probable contingency which might happen.  In making the investments upon bonds and mortgages, therefore, the executors are to be authorized to invest such a sum as will, at six per cent, produce $250 annually.  That is the rate fixed by the rules of the court, in the computation of the value of life annuities, and is as much income as can safely be calculated on from such an investment, which is to be made from time to time for life.  As the testator has di-

Craig v. Craig.

rected the other half of the investment to be made in public stocks of the state, the executors have no discretion upon that subject so long as there are any such stocks to be purchased at par, whatever may be the amount of the annual income of such stocks. And in making the first investment the executors are authorized to purchase above par, stock enough to produce an income of $250, annually, if they cannot get it at par. After that, however, they will not be authorized to diminish the capital of the fund by purchasing stock at a rate beyond its par value; and they ought not then to diminish the income by purchasing stock bearing a low rate of interest. And if the rights of both parties cannot be protected in continuing the investment in stock, the executors may then invest that half of the fund in such bonds and mortgages as the testator has mentioned in his will. Under the provisions of the new constitution limiting the powers to contract state debts, and state stocks being wanted for the purposes of the general banking law, it is hardly probable that state stocks can be obtained at par or under, at a rate of interest above five per cent. The executors are therefore to be authorized to invest in five per cents which have the longest time to run, sufficient to raise an annual income of $250, for the support of the lunatic; and to keep the capital invested in stocks at the same rate of interest, if they can be procured, during his life.

As the capital of the general residuary estate is to be distributed immediately, no provision can be made to supply any deficiency either in this fund or in that provided for raising the annuity of $1600 for the use of the widow. In making both of these investments, therefore, the executors must see that a sufficient sum is invested to raise the annuity, and to reinvest the capital from time to time without diminishing the capital or the income thereof. In relation to both, the executors, as trustees of those who may ultimately be entitled to the capital of the fund, must see that it is safely invested. But in relation to the last mentioned fund, the widow also, by the terms of the will, has a right to be consulted as to the mode of investment, so as to render it safe for her. She has no right, however, to

CASES IN CHANCERY.                  [FEB. 21

direct a mode of investment which will render the capital un-
safe for those to whom it may ultimately belong.

The better course for all parties, probably, is to invest upon
bond and mortgage a sufficient amount of capital to produce
$1600 annually, at the rate of six per cent; as it cannot prob-
ably be made to produce more than at that rate during the whole
period of the widow's life. In case it should produce more, the
surplus will belong to the four children of the testator among
whom the residuary estate is to be divided; as the persons who
are now presumptively entitled to the next eventual estate in
the capital of that special fund. The executors, with the as-
sent of Mrs. Craig, are therefore to be authorized to invest the
capital necessary to raise her annuity of $1600 in that manner.
And if there should be any income from the investment, by
reason of a temporary investment at a higher rate of interest
than six per cent, the executors are to distribute the same
among those who are then presumptively entitled to the next
eventual estate in the capital of the fund.

The executors are only authorized to use so much of the
annual sum of $500 as may be necessary for the support and
maintenance of the lunatic. And the court is called upon to
decide what is to be done with the surplus, if the annuity is
more than sufficient for his support. Trusts for accumulation
are prohibited, except for the benefit of minors. (1 *R. S.* 726,
§§ 36, 37. *Idem*, 773, §§ 3, 4.) A trust to accumulate the
rents and profits of real estate, or the interest or income of per-
sonal estate cannot, therefore, be created for the benefit of a
lunatic. But if this annuity had been given absolutely to the
lunatic, the court might have directed the surplus, beyond what
was necessary for his support, to be paid over to his committee,
and to be invested for his use. For where the income of a lu-
natic is more than can be properly expended for his use, it must,
as a matter of necessity, be accumulated for him, or those who
may be entitled to his property eventually, as his next of kin.
That, however, is not a trust for accumulation prohibited by
the statute. If this annuity was given absolutely to the luna-
tic, therefore, the court would give the proper directions to some

Craig *v.* Craig.

one to invest the surplus for his benefit.   It is evident, however, that the testator did not intend to give to the lunatic any more of the annual income of the fund invested than was necessary for his support and maintenance.   For there is a limitation over, not only of the capital of the fund invested, but of so much of the proceeds thereof as shall remain at the decease of the lunatic.   This is an implied direction to accumulate the surplus income of this capital, by the executors, in trust for adults, or for persons not *in esse* at the time the accumulation is directed to commence; and is void by the provisions of the revised statutes.   There is, therefore, a suspense of the absolute ownership of the capital of the fund, for the life of the lunatic, during which time this part of the income of that fund, not wanted for his support, is undisposed of.   And no valid direction for its accumulation being given, it belongs to the brothers and sisters of the lunatic, under the provisions of the revised statutes on that subject, as the persons who are presumptively entitled to the next eventual estate in the capital of the fund.   (1 *R. S.* 626, § 40.   *Idem*, 773, § 2.)   A mere temporary surplus for a single year, owing to some peculiar circumstances, which may be all expended, in addition to the whole annuity, the succeeding year, would not be deemed an accumulation within the meaning of the statute.   But if there is a permanent surplus, or if any surplus is likely to remain permanently on hand because it is not wanted for the support of the lunatic, it must be distributed among those who were presumptively entitled to the capital of the fund out of which such surplus income arose, when the same accrued.

In reference to the third question raised by the bill, it is only necessary to say there is no trust as to the shares of Mrs. Rhoades and Mrs. Hudson in the annuity fund of their brother, after the death of the lunatic without issue; but upon the happening of that event, they will be entitled to their shares of the fund absolutely, and the executors may pay it over to their husbands with safety.  Their interests in the $6000 which their brother James R. is to pay for the farm, are also absolute interests.  And upon the facts stated in the bill, and admitted in the answers of the adult

defendants, no one can doubt that the devise of the homestead to the widow for life, and the limitations in fee in the same property after her death, embrace not only the dwelling house, but also the whole of the three lots described in the bill, with the warehouse, office, and other out-buildings thereon ; as the same lots were occupied together by the testator, in his lifetime.

The next question which I shall consider, is, whether valid trusts to receive the rents, profits, and income of the shares of Mrs. Rhoades and Mrs. Hudson, for life, are created by the eleventh and twelfth clauses of the will, so far as relates to the real and personal estate embraced in the eighth clause.   *First*, as to the devise and bequest to Mrs. Hudson : If there had been a direct devise and bequest to the executors, of the real and personal estate embraced in that share, in trust to receive the rents and profits and income, during her life, and apply the same to her use, with a limitation over of the capital of the estate to her heirs after her death, there could be no doubt that a valid trust would have been created, vesting the legal title in the executors during the continuance of her life; under the third subdivision of the fifty-fifth section of the article of the revised statutes relative to uses and trusts.   (1 *R. S.* 728.)   And in the case of *Gott* v. *Cook*, (7 *Paige's Rep.* 521,) this court decided that a trust to receive the rents, profits and income of property, and to apply them to the use of the *cestui que trust*, by paying the same over to him in money after they had accrued and been received by the trustee, was applying such rents, profits and income to the use of the *cestui que trust*, within the intent and meaning of the provision of the revised statutes on this subject. It is said, however, that there is no devise or bequest to the executors, as trustees of this share of the estate ; and therefore that Mrs. Hudson takes the legal estate therein, by a devise to her of the income and avails of her share of the property. · This would undoubtedly have been so, as to the real estate, if there had been nothing else in the will to show that the testator intended to create a valid trust of the estate for her benefit during her life. For a devise of the rents and profits of land for life, without any thing more, is but a different mode of expression to create

Craig *v.* Craig.

a devise of the land itself during the same period. (1 *Rob. on Wills*, 3*d Lond. ed* 404.) Here, however, the testator clearly shows that he intends that his daughter Gertrude shall receive the rents and profits of the real estate embraced in that share, as well as the income of the personal estate included therein, through the medium of the executors. The executors therefore take the legal title to her share of the real estate, as trustees, by implication, to enable them to rent the premises, and receive the rents and profits thereof, and pay them over to her, or apply them to her use.

The same question arose, in England, about one hundred and fifty years since, and, as I understand the different reports of the case, was decided the same way, in *South* v. *Allen*, (*Comb. Rep.* 375 ; 5 *Mod. Rep.* 98, *and* 1 *Salk.* 228, *S. C.*) Salkeld, it is true, states the case as having been decided against the executrix, contrary to the opinion of Holt, C. J. But it will be seen by a reference to the record, which is set out at length in the report in 5 *Modern*, that Mrs. Birch and her husband were the lessors of the plaintiff in that case ; and claimed the legal estate in the premises under a clause in the will of her brother, substantially the same as in the present case, devising the rents and profits of the land to her for life, to be paid to her by the executors. Salkeld's report of the case is very short, and states that C. J. Holt seemed strongly to incline to the opinion that the executors were trustees for the wife. But he says the *defendant* had judgment by the opinion of Rokeby and Eyre against C. J. Holt. Comberbach's report, which is also very short, states what the question was, and that Holt, C. J. at first said, it is a devise to the executors by implication of law, else the will cannot be performed, and the other justices agreed with him ; but Holt afterwards said the devise of the rents and profits is a devise of the land to the wife, and then the subsequent words were void and could not exclude the husband. The other judges, however, retained the contrary opinion ; and said that a devise of the rents and profits was not always a devise of the land. For this they referred to the case of *Griffith* v. *Smith*, (*Moor's Rep.* 753,) in which case it was

Craig v. Craig.

resolved by all the judges, in the exchequer chamber, that though a devise of the profits is a devise of the land itself, if there are no other circumstances in the case, yet as the executor was to lease the term and pay over the rent to the testator's poor kindred, to whom such profits were devised, the title to the term was in the executor, as trustee. The case is twice reported in the 5th of Modern Reports, first at page 63, under the name of *Bush* v. *Allen*, and afterwards at page 98, under the same name as in Comberbach and Salkeld. In the report of the case at page 63, C. J. Holt gives a very sensible reason for holding that the legal title was not in the wife, but in the executors as trustees for her. For he says "to be paid by the executors to her, shows the testator's intent that the husband should have nothing to do with it. Why should not this be a devise to the executor for her life, upon trust to pay the profits to her? And this is fully to perform the will; the intent of which was to exclude the husband wholly." He however changed his opinion at the next term. But his associates on the bench adhered to his original common sense exposition of the language of the will, in opposition to the mere technicality upon which his change of opinion was founded. And they accordingly gave judgment for the defendants; thereby sustaining the devise to the executors, by implication, in trust to receive the rents and profits of the premises and pay them over to her.

I am not aware of any decision, either in England or elsewhere, conflicting with the judgment in that case. It is true Cruise says the doctrine laid down by C. J. Holt in that case was fully established in the subsequent case of *Say & Sele* v. *Jones*, (1 *Cru. Dig. tit.* 12, *ch.* 1, § 21.) But he has evidently made a mistake in supposing, from the report of the case of *South* v. *Allen* by Salkeld, that the majority of the judges in that case had decided against the trust, and held that the legal estate was in the wife. It may also be proper to remark that the author of the Abridgment of Equity Cases has made the same mistake, in supposing that the decision in *South* v. *Allen* was against the vesting of the legal estate in the executors, and that Holt's final opinion was in favor of the trust. (*See* 1

Craig v. Craig.

*Eq. Ca. Abr.* 383.) In the case under consideration there can be no doubt as to the intention of the testator to constitute the executors trustees, to receive the rents, profits and income of Mrs. Hudson's share of that part of his real and personal estate embraced in the eighth clause of the will, for her use during her life, and to pay them over to her annually. And as that intention can be carried into effect without violating any rule of law, it is the duty of the court to sustain the trust which the testator intended to create. For, by the express direction of the legislature, in the construction of every instrument creating, or conveying, or authorizing the creation or conveyance of any estate or interest in lands, it is the duty of courts of justice to carry into effect the intent of the parties, so far as such intent can be collected from the whole instrument, and is consistent with the rules of law. (1 *R. S.* 748, § 2.) Here the executors are of necessity the trustees of the personal estate and of the proceeds of the real estate which they are directed to sell. For they cannot preserve the capital of the fund for the remainder-men in fee, who are to take it after the death of Mrs. Hudson, in any other way than by keeping the capital in their own hands, and putting it out so as to produce an income for the owner of the life estate therein. And there is no reason to suppose the testator could have intended to create a different interest in the real estate, which he has by his will united with the personalty in the division directed by the eighth clause of the will.

The language of the devise and bequest of Mrs. Rhoades' share is a little different. But the express direction to the executors to pay the avails and income of that share to her during her natural life, clearly shows that the testator intended that the executors should take the legal estate therein in the mean time, to enable them to lease the real estate and put out the personal estate, and receive the rents and interest, so as to be able to pay them to her. The decree must therefore declare the construction of the will accordingly.

There is no authority given by the will to sell any of the real estate of the testator, except that which is expressly given

as to two lots, by the thirteenth clause of the will. The trustees therefore cannot sell any of the real estate, except those two lots, either for the purposes of division or otherwise. But there is an express power in trust given to the executors, by the thirteenth clause of the will, to divide the real estate as well as the personal estate embraced in the eighth article, into four equal parts; and to invest the shares of Elizabeth and Gertrude for their benefit. And this is a valid and imperative power in trust, under the provisions of the revised statutes, to divide the lands embraced in the eighth clause of the will, other than the two lots directed to be sold, into four equal parts, by a valid legal instrument, setting off the share of each in severalty, under the will.

As James R. Craig, one of the executors and trustees, is also one of the parties interested in the division, the proper course is to divide the real estate embraced in the eighth clause, exclusive of the homestead, devised to the widow for life, into four equal shares, as nearly as practicable, and then by lot to determine to whom each share therein shall belong, unless the four children interested therein, after the division thereof into four parcels, shall agree among themselves which parcel shall be set off to each of them. The decree must therefore direct a partition of those lands accordingly; and that the executors execute, acknowledge and put upon record a proper instrument, to be approved by a master, or by one of the justices of the supreme court organized under the new constitution, evidencing the making of the said division or partition, under the power in trust for that purpose contained in the will. And the executors, in making investments of the capital of the shares of Mrs. Rhoades and Mrs. Hudson respectively, of the personal estate, and of the proceeds of the two lots directed to be sold, must take them in their own names, as executors and trustees under the will; specifying in the securities or certificates to be taken as the evidences of such investments for each, the trusts upon which they are held, and the name of the person who is entitled to the income thereof for life; so that the same may be

Craig *v.* Craig.

kept separate and distinct from all other funds belonging to the estate.

The parties by their stipulation have made provision for the security of the $8000 for their lunatic brother, in case of his restoration to reason. It is only necessary, therefore, to direct as to the investment of this fund, so as to protect the rights of all parties therein. And the safer way to do it is, to invest it upon bonds and mortgages or in stocks, in the name of the clerk of the court of appeals, and to make the income thereof payable to those who are presumptively entitled to the fund. The executors may therefore pay over to J. R. Craig his $2000, upon his giving his bond and mortgage upon unincumbered real estate, of double the value, to be approved of by his co-executor, to the clerk of the court of appeals, conditioned to pay the $2000 to John Craig upon his restoration to reason, to be certified in the manner directed in the will. Or he may procure a good bond and mortgage of a third person, of the same character, to the clerk of the court of appeals, for the $2000, with a condition to pay the interest to J. R. Craig until the restoration of John to his reason, and to pay the principal to the clerk of the court of appeals, for John, upon the happening of that contingency, and to pay the capital to James R. Craig upon the death of John without having been restored to his reason. Or he may have the $2000 invested in the public stocks of this state or of the United States, at par, and may receive the dividends thereon until it is ascertained who is to be entitled to the capital of the fund. La Rue Craig's, Mrs. Rhoades' and Mrs. Hudson's $2000 may be secured in the same manner; except that in reference to the capital of the fund of the shares of the two latter it must be payable to the clerk of the court of appeals for the benefit of John if he should be restored to his reason, and for the use of the heirs at law of Mrs. Rhoades or Mrs. Hudson, after the termination of their life estates therein. And the interest or dividends, in the mean time, must be paid to Mrs. Rhoades and Mrs. Hudson, respectively, for their separate use. Mr. Rhoades and Mr. Hudson, respectively, are at liberty to give their own bonds and mortgages to the clerk of

the court of appeals, with the proper condition to secure the rights of all parties in the $2000 belonging to the shares of their wives, respectively, and to receive that share of the fund from the executors. If either of the four children does not furnish the requisite security within three months after the entry of the decree hereon, the executors themselves may invest the $2000 belonging to his or her share, in the name of the clerk of the court of appeals; or, may pay the same over to him to be invested, in the manner above specified.

In making the investment of the residue of the shares of Mrs. Rhoades and Mrs. Hudson respectively, the executors should invest them upon bond and mortgage on unincumbered real property in this state, of double the value of such investments, or in stocks of this state or of the United States, in such manner as to produce the best income to the owners of the life estates in the fund, and without endangering or diminishing the amount of the capital, by such investments. And in making such investments from time to time, it will be proper for the executors, whenever it is practicable, to consult with each *cestui que trust*, or her husband; so that the investment may be made in a manner which will be most beneficial to her, without endangering the capital.

The executors having accepted the trusts under this will, and one of them having received a legacy of $500, in addition to his share of the commissions, upon condition of executing the trust, it would be improper to accept their resignation and cast the burthen upon others, without some good and sufficient cause. The trusts, as to Mrs. Hudson's and Mrs. Rhoades' shares, however, after the division shall have been made according to the provisions of the will of the testator, will be so far severed from the general trust committed to the executors, as to be capable of being vested in different persons; according to the recent decision of this court in the *Matter of Wadsworth*, (2 *Barb. Ch. Rep.* 381.) Then, upon sufficient cause shown, and upon procuring proper and responsible persons to accept and execute these particular trusts for the usual commissions, or upon receiving a proportionate part of the $500

legacy, the court having jurisdiction of the case would proba-bly accept the resignation of the present trustees as to these particular trusts, and appoint others in their places, upon the giving of proper security to protect the rights of the *cestuis que trust.*

Upon the happening of the contingency of Mrs. Craig's dividing the property which she owned at the death of the testator equally between Mrs. Rhoades, Mrs. Hudson, James R. Craig, and La Rue Craig, the ultimate remainder in fee in the homestead, which is devised to the widow for life, and the capital of the fund appropriated to raise her life annuity of $1600, are only disposed of as a part of the testator's residuary estate, embraced in the eighth clause of his will. If she should so divide her property, therefore, either during her lifetime or at her death, the remainder in fee in the homestead, and the capital appropriated to raise the annuity of $1600, are wholly unaffected by the provisions of the fourteenth clause of the will. In that event this part of the testator's property forms a part of the rest and residue of the real and personal estate, mentioned in the eighth clause of the will as not therein before devised, bequeathed and disposed of. And the same is, upon the happening of the contingency contemplated, to be divided into four shares and disposed of according to the ninth, tenth, eleventh and twelfth clauses of the will: That is, one-fourth thereof will belong to James, and one-fourth to La Rue; absolutely. And the executors will take one-fourth thereof in trust for Mrs. Rhoades for life, with remainder in fee to her heirs; and the remaining fourth as trustees for Mrs. Hudson for life, with remainder to her heirs. For a residuary devise of real or personal estate carries with it not only the property of the testator in which no interest is devised or bequeathed by other parts of the will, but also all reversionary and contingent interests in property which, in the events contemplated by the testator, are not otherwise disposed of. (*Hopewell* v. *Ackland*, 1 *Salk. Rep.* 239. *Brigham* v. *Shattuck*, 10 *Pick. Rep.* 309. *Goodtitle* v. *Knott, Cowp. Rep.* 43. *Willows* v. *Lydcot*, 2 *Vent* 285. *Ridout* v. *Pain*, 3 *Atk.* 485. *Doe* v. *Weatherby*, 11 *East's Rep.*

Craig v. Craig.

322.) It was not the intention of the chancellor to question the correctness of this rule by the decision in *James* v. *James*, (4 *Paige's Rep.* 117,) referred to by the counsel on the argument. That case turned upon the particular language of the residuary clause; which, it was held, expressly excluded the house and lot which the testator had previously devised to his wife for life in lieu of dower, with power in trust to dispose of the same by will, to her children by the testator, at her death. I have since, however, had some reason to doubt the correctness of that decision, upon the ground that the testator must have contemplated the possibility that his wife might refuse to accept her devise of the house and lot and the power to appoint the same after her death, as a provision for her in lieu of her dower. In the case under consideration it is plain, from the language of the will, that the testator did contemplate the contingency of his wife's dividing her property equally among the four children. In that event, therefore, the ultimate fee of the homestead, and the capital appropriated for the raising of the $1600 annuity, was not disposed of by any provision of the will previous to the eighth clause; nor by any subsequent provision which was inconsistent with the disposition made of the residuary estate by the eighth clause of the will.

It is impossible, however, to bring the remainder in fee in the homestead, and the capital of the fund appropriated to raise the $1600 annuity, within the eighth clause of the will, in the event of the widow's making no disposition of her property in her lifetime, or by will, so that Mrs. Rhoades, who is not one of her heirs or next of kin, will get no part thereof as an heir or distributee; or in the event of her making an unequal distribution between Mrs. Rhoades and the other children of the testator except John. In either of those events the testator has, by the fourteenth clause of the will, made a valid and effectual disposition of the remainder in that portion of his property. The title to the real estate will not pass to the executors as a trust, although they will, as executors, have the personal fund in their hands to be disposed of, as directed by this clause of the will, in equalizing the shares of the four children, in reference

Craig *v.* Craig.

to the interests which some of them may have received in the property of the widow. But this clause of the will gives to the executors a valid power in trust, even as to the real estate, so to divide and apportion the same, in the division thereof which they are directed to make, as to produce perfect equality between the four children in reference to what they get of the estate which Mrs. Craig owned at the death of the testator, and what they shall receive of this part of the estate of their father.

The fifty-eighth section of the article of the revised statutes relative to uses and trusts, (1 *R. S.* 729,) provides that where an express trust shall be created for any purpose not enumerated in the preceding sections of that article, no estate shall vest in the trustees; but the trust, if directing or authorizing the performance of any act which may lawfully be performed under a power, shall be valid as a power in trust; subject to the provisions of the next article relative to powers. The substance and effect of the fourteenth clause of the will, therefore, is, that if there shall be an unequal distribution of the estate of the widow among the four children of the testator, named in that clause as entitled to share in the remainder in fee in the homestead and in the capital of the fund appropriated to raise the annuity, the amount which shall have been received by any of them, from the estate of the widow, shall be brought into hotchpot in distribution. And the executors, under the power in trust given to them by this clause of the will, and by the section of the revised statutes referred to, must make distribution accordingly, so as to produce equality.

The revised statutes require advancements to children to be brought into hotchpot in the division of real as well as of personal estate not disposed of by will. (1 *R. S.* 754, §§ 23, 24, 25;) And there is no more difficulty in making distribution upon that principle here, than there would be in a case arising under these provisions of the revised statutes. The value of the property which Mrs. Craig had at the death of her husband must first be ascertained. And if she makes an unequal distribution of the property, or of the proceeds thereof, estimating such value as the capital to be distributed, or if she suffers it to go to her

Craig v. Craig.

own children as her heirs or distributees, so much of such capital of her estate as each child receives, at its then value, must be brought into the account in distribution of the part of the testator's estate which is to be divided and apportioned by the executors under this fourteenth clause of the will. But in the apportionment and disposition which is thus to be made, Mrs. Rhoades and Mrs. Hudson will take absolute interests in their respective shares of the property thus distributed. For, in the events contemplated, this part of the estate is disposed of by the fourteenth clause of the will among the four children, or their representatives, equally. It, therefore, does not come into the residuary estate embraced in the eighth clause of the will, in which Mrs. Rhoades and Mrs. Hudson are only entitled to life estates. The words legal representatives, mentioned in the fourteenth clause of the will, mean those who represent the children who may have died before the distribution of this part of the testator's estate; that is, their personal representatives so far as their distributive shares of the fund consist of personal property, and their heirs at law as respects the part of it which is real estate. The decree must therefore declare the construction of the will in relation to this part of the testator's property, and the rights and interests of his children therein, accordingly. But as the death of some of the children during the life of Mrs. Craig, and before she shall have disposed of her property to any of the children of the testator, may render a further application to the court necessary, the right must be reserved to any of the parties to this suit interested in this part of the testator's property, or any persons who may hereafter become interested therein, to apply for such farther directions as may be necessary, upon the death of Mrs. Craig.

The stock standing in the name of Mrs. Craig, or in the joint names of herself and her husband, at the time of his death, belongs to her; and is a part of her estate to which the testator refers in the fourteenth clause of his will. But that clause of the will does not in any way control or interfere with her right to use and dispose of her property in any manner she may think proper. It only provides that in case she thinks proper to give

Craig *v.* Craig.

it in unequal proportions to any of the testator's children except John, the child to whom it is given, or is left by her, shall bring it into hotchpot in the distribution which is to be made of the testator's property under this clause of his will.

The annuities for the widow and for the support of the testator's son John are to commence from the testator's death; so as to give her the $1,600 in semi-annual payments from that time, and to raise $500 for the support of John for the first year. (*Gibson* v. *Bolt*, 7 *Ves.* 96. *Fearnes* v. *Young*, 9 *Idem*, 553. *Rebecca Owings'* case, 1 *Bland's Ch. Rep.* 296.)

The widow is entitled to the arrears of rents due for lands held in trust as her separate estate; and to the unclaimed dividends upon stocks which formed a part of her separate estate. But the unclaimed dividends, if any there were, upon stocks which stood in the names of the testator and his wife jointly, belong to his estate; although she is entitled to the stock by survivorship, in analogy to a similar interest in lands conveyed to the husband and wife jointly. The executors are also entitled to the moneys refunded for the erroneous assessment upon her lands in the city of Albany; as the legal presumption is that the testator paid the assessment out of his own funds, in the absence of proof that his wife furnished him the funds to pay it out of her separate estate.

The executors are to be at liberty to apply from time to time, if necessary, to pass their accounts in relation to the various trusts. But from the nature of the trusts it does not appear to be necessary to pass their accounts annually; and it would subject the estate to a useless expense. They may be permitted, however, to pass their accounts annually in relation to the shares of Mrs. Rhoades and Mrs. Hudson, with the assent of those *cestuis que trust* respectively. And either of those *cestuis que trust* may apply from time to time, to compel the trustees to pass their accounts and pay over the balances, if any, in their hands, during the continuance of the trust.

The costs of all parties in this suit are to be paid out of the general personal estate of the testator in the hands of the ex·

ecutors. But the costs of any future applications to the court
are to be disposed of hereafter.

---

A reference having been made to a master, in the progress
of this cause, to state the accounts of the complainants as ex-
ecutors of the estate of Archibald Craig deceased, J. R. Craig
was authorized by the order, on such reference, to present his
claim, against the estate, for the amount of a note of $4000,
dated the 31st of January, 1846, payable on demand, and
purporting to be given by the testator to J. R. Craig his son;
so that the master might take testimony and report as to the
validity of the claim; with liberty to the master to make a
separate report on that subject. The master reported in favor
of the validity of the claim, against the estate of the testator, in
a separate report. Exceptions to the report were taken by most
of the other parties who were interested in the estate of the
testator.

*A. C. Paige,* for James R. Craig. The note is a valid note
in the hands of James R. Craig, as a *donatio mortis causa.*
It was executed by the testator and delivered by him to David
Tomlinson, in his, the testator's, last sickness, for the use of
James R. Craig, and to be delivered and paid to him at the
decease of the testator. This transaction has all the charac-
teristics of a valid *donatio-mortis causa.* The gift of the note
was made in the last sickness of the donor, and in contempla-
tion of death. It was to take effect on the donor's death by
his existing disorder, or in his existing illness. It was actually
delivered to a third person, (Tomlinson,) for the use of the
donee, James R. Craig, and to be given to him on the testator's
death. (*Story's Eq. Juris.* § 607, a., and cases cited in notes,
last ed. *Toller's Executors,* 233. 2 *Kent's Com.* 444. 1 *Wil-
liams on Ex'rs,* 499.)

Promissory notes may be subjects of a *donatio mortis causa.*
(1 *Paige's Ch. Rep.* 316. 1 *Cowen's Rep.* 598. *Story's Eq.*

Craig v. Craig.

*Juris.* § 607, *a.* 3 *Bin.* 366. *Duffield* v. *Elwes*, 1 *Bligh's New P. R.* 497.) The only question which can arise on this part of the case is, whether the gift was made in the donor's last illness. It cannot be denied that it was made in contemplation of death; that it was to take effect on the donor's death; and that it was actually delivered to a third person for the use of the donee. Was then the gift made in the donor's last illness? We insist that it was. Doctor Vedder says that there was no recovery from his attack in January, 1846, (during which attack the note was given,) and that the same sickness continued until his death. And he says that the constant apprehension and danger of his death continued from January until he died, in July, 1846.

To make a gift *mortis causa* void, the donor must recover from his sickness. (2 *Kent's Com.* 444. *Swinb.* 18. 1 *P. Wms.* 404. 1 *Ves. Jr.* 546. 3 *Bin.* 366.) There was no recovery here. The donor came to his death by his existing disorder, and in his existing illness. (*Story's Eq. Juris.* § 607, *a,* last ed. 1 *Williams on Ex'rs,* 499, 500.) To make a gift valid as a *donatio mortis causa,* it is not necessary that it should be made in the *last extremity.* It is sufficient if it be made in the last sickness of the donor; the sickness immediately preceding his death, without reference to any precise period of the disease; especially if there be a constant apprehension of death, (as there was here.) (1 *Williams on Ex'rs,* 499, 500. *Blount* v. *Barrow,* 1 *Ves. Jr.* 546. 4 *Brown, C. C.* 81. *Miller* v. *Miller,* 3 *P. Wms.* 356. 1 *Idem,* 404, 441. 2 *Ves. Jr.* 111.) And the apprehension of death may arise from infirmity, or old age, or from external and anticipated danger. (2 *Kent's Com.* 444.) It is not necessary that the donor should be surprised by a sudden and violent sickness, leaving him no opportunity to make a will.

But even if the delivery of the note, on the 31st January, 1846, to Tomlinson, for the use of James R. Craig, was too long previous to the death of the testator to make it a valid *donatio mortis causa;* this objection is obviated by the testator's confirmation, very shortly previous to his death, of the

execution and delivery of the note, as a *donatio mortis causa*. This confirmation is equivalent to an original *donatio. mortis causa* of the note, made at the time of the confirmation. It was a renewal of the gift; a revival of it, if the former donation had ceased to be operative. A *donatio mortis causa* has some of the characteristics of a legacy. It is like a bequest of the testator. (*Story's Eq. Juris.* § 607, *a.*) It is a disposition of his property to take effect after his death; and being such, the intention of the donor, or testator, should not be defeated. The gift should be allowed to take effect unless the law peremptorily forbids it. The gift should be favored. The testator intended that James R. Craig should have this note over and above the devises and bequests made in his favor in the will.

Again; this note may be sustained, in the hands of James R. Craig, as a note given upon a sufficient consideration. If so, it is a legal claim, in his hands, against the estate of A. Craig, deceased.

*J. C. Spencer & M. T. Reynolds*, for J. Rhoades and wife, and for J. T. Hudson and wife. The statements in the master's report as to the consideration and motives of the testator in giving the note, are not sustained by the evidence. Judge Tomlinson and Mr. Gibson are the only witnesses who are competent to testify to the transaction, as it occurred in their presence. Subsequent loose remarks are entitled to no weight against their statements; and least of all, to supply material facts which they do not state. We contend that it is evident from the whole testimony, (particularly the fact stated by Mr. Gibson, that the testator *was satisfied* with the assurance Mr. Gibson had given him that James R. Craig's services and expenses would be a proper charge against the testator's estate,) that there was no pecuniary consideration in the mind of the testator, but that the note was intended as an alteration of his will, and a mere gift. The same requisites are necessary to constitute a valid gift *inter vivos*, and a *donatio causa mortis:* and the only difference between them is that the latter is revoked by the fact of the recovery of the testator from the sick-

ness in which the donation was made; while, if the former be once completed and executed, it is not revocable by any act of the donor. *Walter* v. *Hodge*, (2 *Swans.* 97,) contains the exact rule on this subject, as above stated. In *Irons* v. *Small-piece,* 2 *Barn. & Ald.* 552,) Ch. Justice Abbott says, " It, (a gift,) differs from a *donatio causa mortis,* only in this respect, that the latter is subject to this condition, that if the donor lives, the thing shall be restored to him. In *James Smith* v. *George Smith,* (7 *Carr. & Payne,* 401,) the gift of a watch, by a father to his son, completed by delivery, was held to be irrevocable, and that the father could not reclaim it. In *Grover* v. *Grover,* (24 *Pick.* 261,) it was held that the principle of revocation does not apply to a gift *inter vivos.*

An essential requisite to the validity of a *donation,* or gift, is, delivery of the thing given, or such an instrument of conveyance as transfers the right to immediate possession. In *Irons* v. *Smallpiece,* (2 *Barn. & Ald.* 552,) Ch. Justice Abbott says, " By the law of England, in order to transfer property by gift, there must be either a deed or instrument of gift, or there must be an actual delivery of the thing to the donee." In *Hooper* v. *Goodwin,* (1 *Swans.* 486,) the master of the rolls says: " A gift at law or in equity supposes some *act* to pass the property, if the subject is capable of delivery; if a chose in action, a release or other equivalent instrument; in either case a transfer of the property is required."

A promissory note of the donor is not such an instrument as transfers the property in the amount of money specified, or a right to the possession of it. In former times it was held that no chose in action, neither the promissory note of a third person, nor a sealed obligation, could be the subject of a gift. (*See Miller* v. *Miller,* 3 *P. Wms.* 356; *Ward* v. *Turner,* 2 *Ves. sen.* 442.) But this doctrine is now repudiated, and a bond is capable of gift by mere delivery. (*Blount* v. *Blount,* 1 *Ves. jun.* 546. *Gardner* v. *Parker,* 3 *Mad.* 184.) So as to lottery tickets, (*Grangiac* v. *Arden,* 10 *John.* 293;) or, a promissory note of a third person. (*Coutant* v. *Schuyler,* 1 *Paige,* 318. *Grover* v. *Grover,* 24 *Pick.* 261.) But all these, being execu-

Craig v. Craig.

ted instruments, and having value in themselves, stand upon a footing entirely different from the promissory note of the donor It is true, there are some cases where such a promissory note has been held a valid instrument of gift. (*Bowers* v. *Hurd*, 10 *Mass. Rep.* 428. *Wright* v. *Wright*, 1 *Cowen*, 598. *Woodbridge* v. *Spooner*, 1 *Chit. Rep.* 661. *Seton* v. *Seton*, 2 *Bro. Ch. Ca.* 610.) But these cases are met and overwhelmed by such a torrent of authority that they cannot be maintained. And the principle on which they are assailed is so vital, so universal, that these cases must be abandoned, or the law must be torn up from its foundation. The principle is correctly stated by Blackstone, (2 *Comm. ch.* 30, *p.* 445,) " a consideration of some sort or other is so absolutely necessary to the forming of a contract, that a *nudum pactum*—or agreement to do or pay any thing on one side, without any compensation on the other— is totally void in law, and a man cannot be compelled to perform it." It is true, he afterwards says : " For if a man enters into a voluntary bond, or gives a promissory note, he shall not be allowed to aver the want of consideration, in order to evade the payment ; for every note, from the subscription of the drawer, carries with it an internal evidence of good consideration." That this remark should have been confined to the case of an endorsee, is conclusively shown by Mr. Fonblanque in his note (*a*) at page 355, vol. 1st of his treatise. There is literally no end to the cases which have decided that a *promissory note* cannot be enforced against the maker by the payee, when it appears that there was no pecuniary consideration. (*Buller's N. P.* 274. *Rann* v. *Hughes*, 7 *T. R.* 350.) In Massachusetts the question underwent a thorough discussion in the case of *Parish* v. *Stone;* (14 *Pick.* 198 ;) and most of the authorities are collected in that case. It is entirely decisive of the law, then, that a promissory note of the donor cannot be the subject of a *donatio causa mortis*, or of any gift. This case disposes of *Bowers* v. *Hurd*, (10 *Mass. Rep*, 427,) in which a contrary principle was intimated. 6 *New Hampshire Rep.* 386, settles the law in that state, in the same way. 10 *Conn. Rep.* 485, is equally decisive of the law in that state, in the

same way. 5 *Gill & John.* 54, shows the same law in Mary·
land. In England, the last reported case, directly on this point,
is *Halliday* v. *Atkinson,* (5 *Barn. & Cress.* 501,) which is also
a direct decision that a promissory note cannot be the subject
of a gift. In the state of New-York—with the exception of
*Wright* v. *Wright,* before quoted, and a case in the superior
court of New-York—the decisions have been uniform and un-
interrupted. *Noble* v. *Smith,* (2 *John.* 52,) was a very full and
deliberate examination and discussion of the question. *Pear-
son* v. *Pearson,* (7 *John.* 26,) was an affirmance of the same
doctrine : and it was again repeated directly and distinctly in
*Fink* v. *Cox,* (18 *John.* 147.) There are other cases sustain-
ing the same principle. (*Thorn* v. *Deas,* 4 *John.* 84. *Schoon-
maker* v. *Roosa,* 17 *Id.* 301.) And what is remarkable is, that
none of these cases, were carried to the court for the correction
of errors, although some of them, obviously, were severely con-
tested. Does not this furnish satisfactory evidence of the gen-
eral professional opinion on the subject ? We might have cited an
array of cases and given extracts from all the elementary wri-
ters, who, without a single exception, as far as known to us,
concur in the view here taken—that to render valid and action-
able an executory undertaking, there must be a valuable con-
sideration. But the cases already quoted are so decisive, and
as they contain references to most of the others, we deem it super-
fluous to accumulate them. The case in the superior court of
New-York, (*Parker* v. *Emerson,* 9 *Law Rep.* 76,) is confes-
sedly founded upon the binding authority of *Wright* v. *Wright,*
and upon a mistaken view of *Coutant* v. *Schuyler,* (1 *Paige,*
316,) in which Judge Vanderpool supposes that the chancellor
held that the promissory note of *the testator* was a valid sub-
ject of a gift. The case shows that it was the note of David
Marsh, and the chancellor expressly states the question to be,
whether the note of a *third person* is a proper subject of a gift.
Although *a delivery* of a promissory note would not, according
to our view, render it valid as between payee and maker, or his
representatives, yet in this case even that circumstance is want-
ing. From the testimony, it is evident that this note, although

in the hands of Mr. Tomlinson, was there as a mere deposit; and subject at all times to be recalled by the testator. The case of *Bunn* v. *Markham*, (7 *Taunt.* 224,) is a very strong case to show that the delivery must be absolute, and the prop· erty put so completely out of the control of the donor that he cannot reclaim it. The judges remark upon the fact that the property was to be delivered upon the decease of the testator, as being evidence that there was no delivery by him. Burrough, J. says, the son had no authority to deliver the things to his mother, and it therefore was *not a donatio.* He must mean that there was no authority to deliver to the mother during the life of the testator—for there was an express direction to deliver after his decease. It is evident from the testimony here, that the note was not to be delivered until after the testator's death.

It is true, that in *Coutant* v. *Schuyler*, (1 *Paige*, 316,) the chancellor recognized the decision in *Wells* v. *Tucker*, (3 *Bin.* 366,) that a gift to a third person, for the use of the intended donee, was a valid gift. But it is submitted that the question is still open for consideration, and that upon principle, the gift should be in such a condition that the donee may at once reduce it into his own possession.

*J. V. L. Pruyn & D. C. Smith*, for the infant defendants. On the part of the infant defendants, we adopt the argument of the counsel for Mr. and Mrs. Rhoades, and for J. T. Hudson and wife, who have preceded us; and we also submit the following views in addition. It is essential to the validity of a gift, as well as of a will, that the testator should be of sound mind at the time, and capable of discrimination and the exercise of a proper judgment. In making a will, the term disposing has been used as indicating this state of mind. We say that the testator must be of sound and disposing mind. The revised statutes have used the word competent, which embraces both. It is evident that the testator, Archibald Craig, was in a feeble state of body and mind at the time the note in question was given; although he rallied afterwards, and lived for several months. In the month of April previously, Mr. Gibson, when advised as to al-

Craig *v.* Craig.

tering the testator's will, said it could not be done, as he did not consider him in a state of mind competent to do a legal act. At the time the note was given, Mr. Gibson again advised against making a codicil to the will, for the reason that its va- lidity might be drawn in question on account of the testator's situation. There is, also, intrinsic evidence in the transaction, that the testator could not have been in the full possession of his faculties at the time. He was a clear headed business man, admittedly shrewd in money matters. Now what is the case before us? He had charged his son $6000, payable at the end of five years, without interest, for a farm of 300 acres, which Mr. Linn testifies is worth $60 per acre, or $18,000. He says he would give $50 per acre for it. Deducting simple interest for five years, it would give James the farm for somewhat less than $4500, at the time of his father's death; or, by compound- ing the interest, which for so long a period would be the true mode, it would be about $4200. In other words, $4200 invest- ed at the time of his father's death and accumulated to the end of five years, would amount to the $6000. This last mention- ed sum James was then to pay; and in the mean time he would have had the enjoyment and income of a farm worth from $15,000 to $18,000. Now what did the testator wish to do? He spoke of the $6000 as a large sum for James to pay, although he was to have five years in which to pay it; with this valuable farm and a very considerable estate in hand for the purpose, and was in fact to pay but three-fourths of it; he being entitled to the one-fourth himself. This circumstance alone would be evidence of great prostration of the testator's mental faculties. But he went farther—he desired to relieve him *to some extent,* as Mr. Gibson says he expressed it, against this charge. He thought he had charged him too much for the farm; and directed the note in question to be prepared; which note, if valid, would give James $4000 at once, upon the testa- tor's death, to pay $4200 or $4400, according to the mode of computing interest. Call it the larger sum, and it would leave $400 only as the difference. But as this $4000 would be a charge on the whole estate, before its division, James would

receive $4000 to pay three-fourths of $4400 to the three other children; that is $4000 to pay $3300; in truth, giving him the farm for nothing, and $700 besides, before any part of the testator's estate was to be divided among his children. Is it possible that the testator could have intended this? Is it not in direct conflict with his declared intentions to the persons present at the time? They evidently did not go into any calculations on this subject. Both Mr. Tomlinson and Mr. Gibson concur in showing that the testator named the amount, and that the subject was not discussed. That he did not mean to give James Craig the amount at once is evident, as he refused to give him stocks or property as was suggested by Mr. Gibson to the testator that he should do instead of executing the note.

The whole transaction evidently shows that the testator, in the weakness of his mind, had forgotten what his will was; and, as Mr. Gibson rightly supposed, he was in a state of mind in which a question would necessarily have arisen as to his testamentary capacity if he had altered his will. The inevitable result of his attempted action, if the note should be sustained, would be to defeat his own declared views. He evidently intended that James should give at least some considerable part of the $6000 for the farm. How this intention would be carried out by sustaining the validity of the note in any shape, has already been seen.

It has been said that the note might be sustained as a gift to James R. Craig for services. The attempt to prove services to any extent utterly failed. Certainly none were shown which could have induced the testator to give James $4000 in addition to what he had already done for him. But it is a conclusive answer to this branch of the case to say, that the testator declared his reasons to be of an entirely different character, and such as were stated to Mr. Gibson and Mr. Tomlinson, and have been already adverted to. The attempt to show other declarations of the testator, by the examination of Judge Tomlinson, before the master, entirely failed.

Craig *v.* Craig.

THE CHANCELLOR.   The master is clearly wrong in sup-
posing that there was any consideration for the note in ques-
tion.   It is true the complainant had performed some services
for his father, both before and after the date of the note.   But
from the testimony before the master it is evident those services,
if they were not paid for by the testator, did not enter into the
consideration of this note.   I have also great doubts whether
the testator, at the time the note was given, was in a situation
to make a disposition of his estate, to this extent, with judgment
and understanding.   He had made his will with great care
only six or seven months before, as Mr. Gibson, who drew the
will, testifies.   The will itself also declares upon its face that
it is the intention of the testator that his four children and their
descendants shall share equally, not only in the property which
he holds in his own right, but also in that which is vested in
his wife and subject to her disposition.   And the testator made
a very special provision to carry that intention into effect, as
far as it was possible for him to do so in a testamentary dispo-
sition of his property.   He had, from the spring of 1844, had
several attacks of apoplexy, which affected his nervous system
to a considerable extent.   But in the latter part of January,
1846, he had a much more serious attack than he had ever
before had, which entirely prostrated him; so that his attend-
ing physicians gave it as their opinion that he could not survive.
It was while he was lying in this situation, as I understand
the testimony, that Mr. Gibson, who had prepared the will
with so much care, under the testator's special directions and
dictation, was sent for to alter the disposition which the testator
had previously made of his property in case of his death.   And
it is not pretended that any thing had occurred, either in his
family or in the situation of his property, to induce a change
in the will.   Under such circumstances, I think both Judge
Tomlinson and Mr. Gibson very wisely urged him not to alter
his will at that time.   For if he had attempted to alter it under
those circumstances, in favor of the children who were then
around him, the probability is that the testamentary disposition
then made would have been declared invalid.   The testimony

n relation to the value of the farm devised to James R. Craig, in reference to the amount charged for the same in the will, shows that the inequality in the will was in his favor and not against him. After it was found that the testator was not in a situation to alter his will with safety, some one, who is not named in the testimony, suggested the giving of a note for the four thousand dollars. And then the note in question was drawn by Mr. Gibson, and signed by the testator, and placed in the envelope with his will, and delivered to Judge Tomlinson. The testimony also shows that they were to be kept together, and not to be delivered to any one without the testator's assent, until his death.

It is perfectly evident from the testimony of Judge Tomlinson, that the testator never intended to place this note beyond his own control during his lifetime, any more than he did his will; but that it was to be kept with his will, as forming a part of the testamentary disposition of his property. If Tomlinson was the mere agent of the maker of the note, to keep it for him—with his will and subject to his control—and not merely as the trustee of the son to hold it for the use of the latter, in case the disease under which the donor was then laboring should terminate fatally, so as to place it beyond the reach of the maker of the note unless he should recover—it wanted one of the essential requisites of a good *donatio mortis causa;* an absolute delivery, and continued change of possession. (*Bunn* v. *Markham*, 7 *Taunt. Rep.* 224.)

Again; the weight of authority appears to be against the principle that the donor's own note, merely creating a debt against himself, can be the proper subject of a gift *mortis causa.* Most of the cases referred to for the purpose of showing that such a gift is valid, were cases of gifts *inter vivos.* For until within about thirty years, it was supposed to be the law, that a promissory note was not only *prima facie* evidence of value, but that it could not be contradicted by parol evidence to show that the maker had actually intended to give a void note, for which he knew there was no consideration whatever; and that it was only open to him to impeach the note by showing a *failure* of

Craig *v.* Craig.

the consideration upon which it was given or intended to be given, or that the consideration was illegal. Thus, in the case of *Seton* v. *Seton,* (2 *Bro. Ch. Rep.* 610,) where the mother gave her promissory note to a third person, as a trustee of a child of which she was then *enciente,* Lord Thurlow overruled a demurrer to a bill in behalf of the child, considering it a valid gift to the child. That, however, was not a gift *causa mortis,* for the bill was filed against the mother herself; and in *Tate* v. *Hilbert,* (2 *Ves. jun.* 112,) which came before Lord Rosslyn four years afterwards, although he held that the note given in that case was not a gift *mortis causa,* and that the complainant had no right to come into equity for it, he intimated a decided opinion that the payee of the note could recover it at law as a valid gift *inter vivos.* He indeed says it would be no objection to an action on the note that the payee had given no value for it; and the bill was dismissed without prejudice, that the decision might not be deemed a decision of the court against the right to bring such an action. And in *Woodbridge* v. *Spooner,* (1 *Chit. Rep.* 661,) which came before the court of king's bench in England in 1819, that court directly decided that such a note was valid as a gift *inter vivos ;* and that the personal representatives of the maker were not at liberty to avail themselves of the want of consideration. A similar decision was made by the supreme court of Massachusetts in 1813, in the case of *Bowers* v. *Hurd,* (10 *Mass. Rep.* 427.) In both of those cases, however, it was admitted by the court that the promissory note of the donor could not be supported as a *donatio mortis causa.* It has since, however, been decided in Massachusetts and in England, as well as in this state, that the promissory note of the donor is not a good gift *inter vivos ;* and that the donor, or his representatives, may impeach such a note for want of consideration. (*Parish* v. *Stone,* 14 *Pick. Rep.* 198. *Halliday* v. *Atkinson,* 5 *Barn. & Cress.* 501. *Fink* v. *Cox,* 18 *John. Rep.* 145.)

It was at a very early day decided in England that a draft, by the donor upon his banker, payable after his death, for mourning, accompanied by an actual delivery of the draft to

---

Craig *v.* Craig.

---

the donee, in the last sickness of the donor, and intended tc take effect after his death, was valid as a *donatio mortis causa;* such draft being accompanied by a written declaration showing that it was only intended to operate in case of the death of the donor. And Sir Joseph Jekyl decreed that it should operate as an appointment, or an appropriation of the amount of the fund for which it was drawn, to the use of the donee. (*Lawson* v. *Lawson,* 1 *P. Wms.* 141.) I am not aware that that decision has ever been overruled. Indeed, Lord Rosslyn, in the case of *Tate* v. *Hilbert,* before referred to, after examining the register's books, said that decision was right; upon the ground that it appeared by the written memorandum that it was not intended to operate immediately. And as that was the law in England previous to our separation from the mother country, it may still be the law here. In the case of *Wright* v. *Wright,* (1 *Cowen's Rep.* 598,) the late supreme court of this state decided that the donor's own note was a good gift *mortis causa;* and that a suit was properly brought against the representatives of the donor upon the note itself. That decision has recently been overruled by a branch of the new supreme court, in the case of *Harris* v. *Clark,* (2 *Barb. Sup. Court Rep.* 94;) where it was held that an action at law could not be maintained by the donee of a draft against the personal representatives of the drawer. That decision, however, as I understand it, is not in conflict with the decision of Sir Joseph Jekyl in the case of *Lawson* v. *Lawson,* that the draft may operate as an appointment of the fund upon which it is drawn. The opinions of the judges in the cases of *Woodbridge* v. *Spooner,* and of *Bowers* v. *Hurd,* before referred to, are in conflict with the decision in *Wright* v. *Wright,* that the promissory note of the donor is a good gift *mortis causa.* In addition to this, the courts of three or more of our sister states have decided that such a note is not valid. (*Parish* v. *Stone,* 14 *Pick. Rep.* 198. *Raymond* v. *Sellick,* 10 *Conn. Rep.* 480. *Copp* v. *Sawyer,* 6 *N. Hamp. Rep.* 386.)

As I said before, therefore, the weight of authority is against the validity of the donor's promissory note as a gift *mortis*

*causa.* And when it is seen how easy it is for those who are surrounding the bedside of a dying man to obtain from him, by importunity, gifts of that character, the safer rule is to hold a note of that kind invalid.

The exceptions to the master's report must be allowed; and the claim for the amount of the $4000 note, must be rejected as illegal or unfounded. But this is not a case to charge the claimant personally with costs. The costs of the parties upon the exceptions to the report and upon the reference, as to this claim, must therefore be paid by the executors out of the personal estate of the decedent.