ABRAHAM V. VAN FLEET, JOHN T. BIRD, HENRY C. PITNEY
AND ROBERT S. GREEN, VICE-CHANCELLORS.

NEHEMIAH MERRITT

*v.*

GEORGINA MERRITT et al.

By his will, a testator directed his executors to invest $15,000 upon bond and mortgage, and pay the income thereof, in equal quarter-yearly payments, to his son N. during the son's life. Subsequently, by codicil, he revoked the provision of his will referred to, and, in lieu thereof, directed his executors to invest, upon bond and mortgage, "sufficient money to produce the annual sum of $1,000," which they were to pay in equal weekly payments to the son during his life. The *corpus* of the fund, thus to be invested, was given to the tes-

1

tator's four unmarried daughters and one married daughter at the son's death. Other legacies were given, and then the residue of the estate, real and personal, was given to the four unmarried daughters, who were made executrices of the will. When the highest legal rate of interest was six per cent., and desirable investments upon bond and mortgage could with difficulty be had at a higher rate of interest than five per cent., the executrices appropriated $17,000 to answer the annuity, and invested it by purchasing bonds and mortgages that were past due. After this action, they reported their investments to an orphans court, under *Rev. p. 777 § 115*, for approval, and secured that court's approval of them. Then they accounted as executrices, giving notice of presentation of their account for settlement in the manner required by the statute (*Rev. p. 774 § 102*), and in their account asked allowance for the $17,000 which they had invested for N. Then, without further notice, they procured from the orphans court a decree for the allowance of their account and the distribution of the residue of the personal estate in their hands. N. had no actual notice of these proceedings, but was afterwards told that $17,000 had been invested for his annuity, and, after such knowledge, accepted checks which, upon their face, recited that they were for interest collected from the investment for him under his father's will, and he also recognized the appropriation, without protest against it, in other proceedings touching reinvestment of the moneys and accountings by the executrices. The investments having failed to yield the annuity, he now brings suit in equity to compel an additional appropriation from his father's residuary estate to secure the annuity.—*Held*, (1) That the testator intended to provide for his son, from his entire ‹state, an annuity for life. (2) That, though it be assumed that the appropriation was justly made, it was but a means to an end, and was not final so as to release the residuary estate from liability to supplement it in case of necessity. (3) That in making the appropriation the executrices did not have just regard to present and future contingencies and expenses, and that therefore their appropriation was not rightly made. (4) That, as N. did not have notice of the application to the orphans court for the approval of the investments, he was not bound by the court's action, and that if the orphans court had jurisdiction to sanction the appropriation (which is not decided), its mere approval of the character of the investments was not a sanction of the appropriation. (5) That if the orphans court possessed jurisdiction to interpret the testator's will for the purpose of making an order of distribution (which is not decided), it could not bind N. by its decree in the premises, without his having had actual notice of its contemplated action and an opportunity to be heard. (6) That by his acts subsequent to his knowledge of the appropriation, N. is not estopped from maintaining his present suit.

Final hearing on bill, answers and proofs.

*Mr. M. P. Grey* and *Mr. W. H. Hepburn* (of Philadelphia), for the complainant.

*Mr. T. N. McCarter,* for the defendants Georgina and Florence Merritt.

*Mr. A. V. Schenck,* for the defendants Helen and Elizabeth Merritt.

THE CHANCELLOR.

George Merritt died in Rome, Italy, on the 23d of December, 1873, having made a will at New Brunswick, New Jersey, on the 3d of October, 1871, to which, on the 29th of December, in the same year, at Nice, France, he added a codicil.

By the will, after directing the payment of his debts, he gave to each of his four daughters, Elizabeth, Georgina, Helen and Florence, a legacy of $10,000, and directed that $15,000 be invested for the benefit of his remaining daughter, Isabella. The third and fifth paragraphs of the will are in this language :

"*Third.* I order and direct my executors to invest safely and upon first real estate mortgage, and to keep the same so invested, the sum of fifteen thousand dollars, and to pay the interest and income thereof in quarterly payments every year after my decease to my son Nehemiah Merritt during his life, and upon his decease to pay the said principal moneys, in case he should have any lawful issue, to such issue, in equal parts as tenants in common, and in case he shall not leave any such issue, then to pay the said principal money to all my surviving children, and the children of my deceased child or children, the same to be divided equally, the child or children of any deceased child or children taking the same share which the parents if living would be entitled to.

"*Fifth.* All the rest and residue of my estate, both real and personal, including lands at Perth Amboy, New Jersey, and elsewhere, and all bonds and evidence of debt and other personal property, whatsoever and wheresoever situated, I give, devise and bequeath unto my said four unmarried daughters, Elizabeth, Georgina, Helen and Florence, their heirs, executors, administrators and assigns forever, to have and to hold the same in equal parts or shares as tenants in common."

The four residuary devisees and legatees were made executrices of the will.

By the codicil, he provided as follows :

" I do hereby revoke and declare null and void the legacy of fifteen thousand dollars ($15,000) devised and bequeathed by me in my last will and testament of date above mentioned to my son Nehemiah Merritt, and, in lieu thereof, I do

Merritt *v.* Merritt.

hereby direct the executors of my aforesaid will and testament to invest in bond
and mortgage, on good landed securities, sufficient money to produce the annual
sum of one thousand dollars ($1,000), the said one thousand dollars per annum
to be paid in equal weekly payments to the said Nehemiah ; and it is further my
desire that my executor or executors shall cause the said one thousand dollars
to be placed in a reliable bank in New York city, subject to the weekly order
of said Nehemiah Merritt, and his receipt will be the discharge for the above ;
and it is my desire that after the decease of my son Nehemiah Merritt, the
moneys above named secured by bond and mortgage shall be divided share and
share alike between my five daughters ; if one of them die without heirs, then
her share to be divided among the others, but subject to the provisions of my
above-named will and testament."

And also directed that if his wife should survive him she
should control his estate, as he could have controlled it if alive,
for two years, making sale of it, if her judgment should so
dictate.

The will and codicil were proved before the surrogate of Mid-
dlesex county, in May, 1874, and letters testamentary were then
issued to the testator's widow and his daughter Florence. In
August, 1877, letters testamentary were issued to the daughters
Elizabeth, Georgina and Helen, and the testator's widow and
daughter Florence accounted, showing the balance of the personal
estate in their hands to be $70,000, which was then invested, at
seven per cent. interest, in a single mortgage. The proofs dis-
close that after such accounting the actual management of the
estate was undertaken by Elizabeth Merritt and conducted
by her alone until June, 1881, when she turned it over to her
sisters Georgina and Florence, the personal estate then remaining
invested in the single mortgage for $70,000.

In July of the same year Elizabeth and Helen petitioned the
orphans court of Middlesex county to require and empower
Georgina and Florence, the then acting executrices, to make ap-
propriations and investments for the trusts for the benefit of
Isabella and Nehemiah. Of this proceeding neither Isabella nor
Nehemiah had notice.

The acting executrices answered the petition by stating that
the whole personal estate was then invested in the single mortgage
for $70,000, which had been extended, at six per cent. interest,
so that it would not be payable until 1884, and that it was there-

Merritt v. Merritt.

fore impracticable, without sacrifice, to, at that time, divide the estate.   In 1884 the mortgage for $70,000 was paid, and, on the 1st of August in that year, Georgina and Florence, yet the acting executrices, purchased four mortgages, aggregating $17,000, all of which were then, by their terms, due and payable, taking an assignment of them to themselves as executrices of their father's estate "and trustees under his will for Nehemiah Merritt." Six months later, in February, 1885, they reported the investments to the orphans court and, without notice to Nehemiah, obtained that court's approval of them.   Two months later, in April, 1885, they accounted in the same court, and in their account asked allowance for the $17,000 invested for Nehemiah and the $15,000 invested for their sister Isabella. The account, after deducting the allowances claimed, exhibited a balance of $34,966.21 for distribution.   Nehemiah then lived in Pennsylvania, and had no actual notice of the accounting. Notice of the accounting, however, it is assumed, for there is no proof to the contrary, was published according to law and in due time.   There being no opposition, the account was allowed by the court.   Thereupon the $34,966.21 balance was, by the court's order, divided equally between the four sisters, Elizabeth, Helen, Georgina and Florence.   A week after the allowance of this account, Nehemiah was informed, by letter from the acting executrices, that $17,000 had been appropriated and invested for his benefit, and, at the same time, was requested by them to sign an agreement having reference to the income of the fund, which agreement, by its terms, involved an acknowledgment and adoption of the appropriation for his benefit.   After the receipt of the letter he had a conference with the counsel of the acting executrices, at which he refused to sign the agreement. About this time he secured the services of Mr. W. H. Hepburn, a lawyer, of Philadelphia, and, in October, Mr. Hepburn retained the lawyer in this state who had theretofore represented Elizabeth and Helen Merritt, with a view to the commencement of proceedings against the acting executrices to compel them to make weekly payments to his client and supplement the appropriation that had been made for the security of the annuity.   The correspond-

ence between Mr. Hepburn and this gentleman, now read in the light of the entire case, most clearly exhibits that that which Mr. Hepburn principally desired to accomplish was the addition to the appropriation, but the New Jersey counsel appears to have labored under the misapprehension that he was retained for no other purpose than to compel the acting executrices to perform their trust by making weekly payments to Nehemiah, or to cause them to be removed from office.

During this apparent misunderstanding, in March, 1886, under the guidance of his New Jersey counsel and with the knowledge of Mr. Hepburn, Nehemiah petitioned the orphans-court of Middlesex county to remove the then acting executrices and grant letters of administration *cum testamento annexo* to some fit person, alleging as a ground therefor that those executrices had settled their account, in and by which they were allowed the sum of $17,000 invested for him under the trusts and requirements of his father's will, and that they had moved out of the state and had refused to execute and fulfill the trust under the will by paying him $1,000 a year in weekly payments. To that petition the acting executrices Georgina and Florence answered, setting up their appropriation and investment for Nehemiah ; its approval by the orphans court; their subsequent accounting, in which they were allowed the sum invested, and the fact that Nehemiah had recognized the investment by endorsing and obtaining money upon three checks which they had sent him, which upon their faces recited that the money to be paid was "interest collected on investment for him under the will of George Merritt, dec'd."

After the answer to the petition was presented, Mr. Hepburn became so importunate and pronounced in his demand that a sufficient appropriation to meet the annuity should be made, that his purpose could not be mistaken, and, because action in the direction proposed would be detrimental to the interests of Elizabeth and Helen Merritt as residuary legatees and devisees, and they were his clients, the New Jersey counsel withdrew from further representation of Nehemiah. After the withdrawal of the gentleman last referred to, another lawyer of this state was retained,

who petitioned the orphans court to require the acting executrices to account, the annuity being over $600 in arrears.    This gentleman and Mr. Hepburn also appeared for the annuitant upon an application by the executrices to the orphans court for leave to reinvest $8,000 of the appropriated $17,000 at five per cent. Later, other counsel of this state were consulted, and by them the present suit was commenced.    Its object, in short, is to compel an additional appropriation from the residuary estate of George Merritt to secure the annuity.

In December, 1886, a portion of the lands of George Merritt were sold in partition proceedings in this court for $11,000, and because this sum was a portion of the residuary estate, and in the possession of the court, and the residuary legatees and devisees were without the jurisdiction of the court, it was impounded to abide the event of this suit.

The proofs disclose that when the appropriation by the executrices was made the legal rate of interest was six per cent., but that it was almost impossible to obtain suitable and safe investments for trust funds on bond and mortgage at that rate, and that for such investments not more than five per cent. could readily be had, and also that the mortgages actually purchased were, at the time of the appropriation, past due and payable at the pleasure of the respective mortgagees.

The four residuary legatees and devisees urge, in their defence, that the appropriation for the annuity to Nehemiah was final and binding upon him—*first*, because, as an act by them *in pais*, it was a just and complete execution of the testator's intention; *second*, because it was sanctioned by a court of competent jurisdiction; and, *third*, because by acts of ratification and acceptance the complainant is estopped from complaining of it.    And they further claim, that if the appropriation is not conclusive and final, it is a charge only upon the personal estate of the testator, which is insufficient to pay all the legacies, and that, therefore, with the other legacies, it must abate.

Before entering upon inquiry whether the appropriation was rightly made, the question is suggested, whether, even if it were so made, it is final, so that any loss occasioned by its failure

must fall upon the annuitant. The disposition of this question involves the ascertainment of the intention of the testator as it is evidenced in his will, because the ground upon which the court may interfere is its supervisory control over the due administration of the trust intended, and it is necessary to such control that the extent and meaning of that trust shall be understood. The intention of the testator is to be gathered, not from the codicil alone, but from both will and codicil. By the will his scheme was to have $15,000 invested upon bond and mortgage for his son, the income from which should be paid to him in quarter-yearly payments. At the time the will was made the legal rate of interest was seven per cent., and the proposed investment would probably yield more than $1,000 a year in gross and nearly $1,000 above the average expenses of the trust. But this provision did not assure a fixed and stable income of $1,000. Less than three months after the will had been made the provision for the income of a fund was abandoned, and, in lieu of it, the testator directed his executors to invest in bond and mortgage, not $15,000, but "sufficient money to produce the annual sum of one thousand dollars," which annual sum was to be paid to the testator's son in equal weekly payments. The testator's design obviously was to give and secure to his son a yearly legacy or annuity of a certain amount, instead of an uncertain, fluctuating income from a fund. His scheme, further, was to give his daughter Isabella the income of $15,000, and each of his married daughters $10,000 in cash, and then the residue of his estate, real and personal, to his four unmarried daughters, who were to be the executrices of the will.

It is established in this state that a gift of the residue of an estate, after the payment of legacies, real as well as personal, in a blended mass, will, without express words to that effect, be held to charge the payment of the legacies upon the testator's entire estate, real as well as personal. *Hawk. Wills 294; Corwine* v. *Corwine, 8 C. E. Gr. 368; S. C. on appeal, 9 C. E. Gr. 579; Johnson* v. *Poulson, 5 Stew. Eq. 390; Stevens* v. *Flower, 1 Dick. Ch. Rep. 340.* Under this rule the annuity to Nehemiah, which

is nothing but a succession of legacies of $1,000 each, payable yearly, was charged upon the testator's entire estate.

Now, having ascertained the testator's intention, what did his direction to the executrices to invest a fund to produce the annuity mean? Was the purpose of that direction to release the residuary estate? Or was it a precautionary security against the dissipation of the estate by the residuary legatees and devisees, and their insolvency?

In *May* v. *Bennett, 1 Russ. 370,* the testator gave his entire estate in trust to his executors to discharge his debts and then invest in what government securities they pleased as much money as would produce the annual interest of £54 12s. for the sole use of his wife, which interest she was to have during her life, if she did not marry again. Legacies were also bequeathed, and the residue of the estate was given to one of the executors. In execution of the trust the executors invested £1,092 in navy five per cent. annuities, which yielded £54 12s. Eighteen years after the investment the stock invested in was, by law, converted into £1,146 12s. new four per cent. bank annuities, which produced only £45 12s. a year. It did not appear that there was any residue of the estate beyond the fund invested for the widow, but, if there was, it had been paid to the residuary legatee, who had died many years before the suit was brought.

The bill was against the personal representatives of both the testator and the residuary legatee, and it asked that past and future deficiencies in the annuity might be made either out of the testator's estate, beyond the fund invested for the annuity, or out of the *corpus* of the fund itself. Lord Gifford, M. R., held that, as the testator intended to provide an annuity for his wife, she was not to be prejudiced by the failure of the appropriation, and that the deficiency should be made good from the testator's general estate, or, that failing, from the *corpus* of the investment.

The principle upon which this case was decided was, that the direction to invest a fund was subordinate to, and controlled by, the paramount intention that the widow was to have the annuity if the testator's estate would yield it.

The doctrine of this case has been repeatedly approved by the courts of England. *Davies.* v. *Wattier, 1 Sim. & S. 463; Wright* v. *Callender, 2 DeG., M. & G. 652; Croly* v. *Weld, 3 DeG., M. & G. 993; Mills* v. *Drewitt, 20 Beav. 632; Ingleman* v. *Worthington, 25 L. J. Ch. 46,* and *Gee* v. *Mahood.* The last of these cases was elaborately considered, first by Vice-Chancellor Hall (*L. R. (9 Ch. Div.) 151*), and then by the lord justices upon appeal (*L. R. (11 Ch. Div.) 891*), where the vice-chancellor's decision was reversed, and then in the house of lords (*sub nom. Carmichael* v. *Gee, L. R. (5 App. Cas.) 588*), where the ruling of the lord justices was affirmed, and *May* v. *Bennett* and *Wright* v. *Callender* were cited by the lord chancellor (Selborne) with approval.

*Wright* v. *Callender,* above cited, in its facts touching the question here considered, is more precisely like the present case than *May* v. *Bennett;* for there, as in this case, the fund invested was not to go to the residuary legatees. In that case a testator directed his executors to stand possessed of his personal estate in trust to invest a sufficient portion of it in the public. funds of Great Britain, or upon other government securities, to produce an income of £2 a week, to be paid by the executor to the testator's son during the term of that son's natural life. The residue of the estate was bequeathed, and it was provided that after the son's death the fund invested should go to a class of persons who would not necessarily be the residuary legatees.

The executors invested the entire residue of the personal estate; after paying debts and funeral expenses, but its income proved to be insufficient to pay the annuity. The annuitant applied to the court to value his annuity in gross and pay it to him out of the fund, if the fund could not be supplemented. Vice-Chancellor Kindersley thought that the bequest of the fund to others than the residuary legatees indicated that its integrity was to be preserved, and that, as it could not be supplemented because there was no residue of the personal estate, the annuitant could take only the income of the fund. But, upon appeal, the lord justices thought otherwise. They held that the testator intended to provide an annuity for his son, and that, if there was no residuary estate to supplement the fund invested, that the *corpus* of the

fund should be devoted to the payment of the annuity, but that the annuity would not be valued in gross and paid to the annuitant. Lord Cranworth said : " The testator intended £104 a year to be paid to James, and gives him that annuity. How is the case varied by his saying, that after the death of the annuitant the fund set apart to answer the annuitant is given over ? If there had been anything in the terms of the gift over showing that the testator intended the fund to be continued in its integrity during the life of the annuitant and in that state to go over, the argument might be well founded. But the direction to set apart the fund does not denote the object of the testator, but merely the means by which that object was to be secured. I do not see any substantial distinction between this case and *May* v. *Bennett*. There Lord Gifford held that the setting apart the fund was only a means to an end, and that if that means failed, the intention was that the actual amount of the annuity should be made up out of other assets."

These cases appear to be so closely in point with the one before me, and to have been so well considered and repeatedly reconsidered with approval by other and fresh minds, that I think I should not hesitate to accept them as controlling precedents, notwithstanding my attention has been directed to a departure from them by the supreme court of Maine, in *Orr* v. *Moses, 52 Me. 287*, and *Nutter* v. *Vickery, 64 Me. 490*.

The testator did not mean that the payment of the annuity should depend upon the appropriation. The appropriation was merely a means to an end, and no matter how fairly it should be made, its subsequent failure to answer its purpose was not to defeat the annuity. It was not designed to release the residuary estate upon which the annuity was charged.

Here, in passing, another objection, that the direction to invest a fund in bond and mortgage brings the case within a class of decisions of which *Kendall* v. *Russell, 3 Sim. 424*, is a type, may be commented upon. In that case the direction was to buy sufficient stock in the navy five per cent. annuities to yield annually £3,000, which were given to the testator's daughter. The stock afterwards was converted into four per cent., which did not yield

£3,000, and it was held that the daughter must abide the loss.
The case was distinguished from *May* v. *Bennett* in that the tes-
tator directed the particular investment and otherwise indicated
that the annuity was intended to be charged upon that investment
only. The case before me cannot be distinguished from *May* v.
*Bennett* in this way. Here the direction is to invest generally
upon bond and mortgage. Not in any particular mortgage or at
any particular rate of interest. In *May* v. *Bennett* there was a
general direction to invest in "government securities." In
*Davies* v. *Wattier* there was a general direction to invest in
"public funds," and in *Wright* v. *Callender* the investment was
to be in "public funds of Great Britain." It does not appear
that the direction for investment in the present case is a whit
more particular than the direction in the cases last mentioned.
It was to invest generally upon bond and mortgage, a kind of
security as extensive and general as governmental stocks. I
cannot distinguish it in principle from the cases last mentioned.
· But if my conclusion as to the testator's meaning in directing
an investment for the annuity be wrong, was the appropriation
in this case such an one as the testator designed ?

    While the limit of legal interest was seven per cent. and mort-
gages at that rate could readily be found, so that the yield from
$15,000 would be $50 more than the proposed annuity, the tes-
tator determined that such an investment would be insufficient,
and that its income would not, with certainty, yield his son the
yearly sum he desired him to have. But the executrices, who
were charged with the duty of making secure the intended an-
nuity by a sufficient investment, without heeding the caution that
the testator suggested to them, when the limit of legal interest
had been reduced to six per cent., and when there was but little
demand for money upon bond and mortgage at that rate, set
apart barely $17,000, the interest of which, at the extreme legal
limit, would amount to only $20 more than the annuity. The
testator rejected a sum which would produce $50 surplus, but
his trustees did not hesitate to fix a sum which, at best, would
not produce more than $20 surplus. It is clear beyond all ques-
tion, that such a surplus would not pay the ordinary and usual

expenses of the trust, which would include taxes upon the fund invested, trustees' commissions, and the expenses of investment and necessary accountings.

The testator's intention was, that the appropriation should be sufficient to yield $1,000 above all expenses, and that that full sum should be paid annually to his son. But, more than this, in making an appropriation to meet this requirement, it was incumbent upon the executors to have just regard, not only to present contingencies and expenses, but also to the probable contingencies and expenses of the future. In *Craig* v. *Craig, 3 Barb. Ch. 76,* where question as to an appropriation for an annuity arose, Chancellor Walworth said, that the testator's intention was to leave an undiminished income of $500 yearly for the support of his insane child, and that in directing a sum to be set apart to secure that annuity, the testator did not intend that his executors should invest a capital at seven per cent., the legal interest of which would produce $500 annually, but an amount sufficient to produce at least $500 in legal interest at rates at which such capital could be kept invested during the probable continuance of the life of his son; and he then directed the executors to set apart a sum which, at six per cent., would produce the clear annuity, it being as much income as could be safely calculated upon from investments which are to be made from time to time for life. In *Kendall* v. *Russell,* above cited, the vice-chancellor, speaking of the appropriation that the court would have made if the navy five per cent. annuities had been reduced to four per cents before the testator died, and the court had been called upon to make the appropriation, said that it would have directed the investment of a sufficient sum in three per cents to produce the annuity.

The wisdom of thus fixing the appropriation by a rate of interest less than the extreme limit allowed by law is illustrated in this very case, when the testimony as to the efforts and failure of the trustees to procure suitable loans at a higher rate of interest than five per cent. is considered. When the appropriation was made the monetary condition of the country was such that it plainly foreshadowed a decline in the rates of interest, and it is

difficult for me to understand how the executrices, if acting in good faith and not in their own interest as residuary legatees, could have thought that an appropriation, based upon interest at the highest limit allowed by law, was a just fulfillment of their trust. The appropriation clearly appears to me to have been insufficient.

But it is claimed that it was sanctioned by a court of competent jurisdiction, and that therefore the annuitant should be bound by it.

I find nothing in the case to show that the orphans court directed the amount of the appropriation or passed upon the sufficiency of it. After it had been made by the executrices *in pais*, and the moneys thus appropriated had been invested, the investments were reported to the orphans court for its approval in virtue of the jurisdiction conferred by the one hundred and fifteenth section of the Orphans Court act. *Rev. p. 777.*

But if the orphans court had passed upon and fixed the amount of the appropriation (and I fail to perceive that it had jurisdiction to do so), its action was not binding upon the annuitant, because he was not a party to the proceedings. The recitals in the court's order approving the investments disclose that only the executrices, who were also the residuary legatees, were before the court, and the annuitant most positively testifies that he had no notice or knowledge of the proceeding. It is, however, insisted, that an attorney of this state at some stage of the matter appeared for him, and that for that reason he was bound. No such appearance is shown by the record, and the annuitant, under oath and without contradiction, denies that the attorney in question had any authority to appear for him. Such uncontradicted denial of authority must dispose of this insistment; for notwithstanding a licensed attorney at law in this state do actually appear of record for a party to a suit, his want of authority to so appear may be shown. *McKelway* v. *Jones,* *2 Harr. 347; Gifford* v. *Thorn, 1 Stock. 722; Hess* v. *Cole, 3 Zab. 116; Price* ads. *Ward, 1 Dutch. 225; Dey* v. *Printing Co., 14 Stew. Eq. 419; Mutual Life Ins. Co.* v. *Pinner, 16 Stew. Eq. 56.*

Merritt *v.* Merritt.

In the next place, the defendants urge that if the amount of the appropriation was not fixed by the court when the investments were approved so as to bind the annuitant, it was so fixed upon the accounting of the acting executrices when the sums invested were allowed and a balance was struck and distributed in accordance with the terms of the will.

They contend that by means of the published notice of the settlement of the account, which the statute required the executrices to give (*Rev. p. 774 § 102*), the defendant had at least constructive notice of the proceeding, and that under the authority of *Exton* v. *Zule, 1 McCart. 501*, subsequently recognized in *Sayre* v. *Sayre, 1 C. E. Gr. 505*, and *Search* v. *Search, 12 C. E. Gr. 137*, that notice was sufficient to bind him by the distribution subsequently ordered.

I do not think that the cases cited bear out the conclusion contended for. Those cases recognize the binding force of a decree of distribution, upon such constructive notice, only in favor of, and as protection for, an administrator in case of the distribution of the estate of an intestate. It was distinctly held that it does not affect the right of an omitted distributee to his remedy against distributees who have received the estate.

But the distribution in the case before me is not of the estate of an intestate. If the court had power to construe the will and make distribution in this case, it must have acted in virtue of the one hundred and fifty-first section of the Orphans Court act (*Rev. p. 785*), and it has been held by the court of errors and appeals of this state, in *Adams* v. *Adams, 1 Dick. Ch. Rep. 298,* that before action can be taken under that section, so as to bind those interested, actual notice of the proceeding must be given.

In this case the annuitant did not have actual notice, and as to him the action of the court, so far as it affected his rights under the will, was *coram non judice.*

I am now brought to the question, whether Nehemiah is estopped by accepting checks which purported to have been drawn for interest from investments which had been made for him, and by reciting in petition to the orphans court that $17,000 had been invested for him under his father's will, and by subse-

quently appearing in the orphans court in proceedings touching the reinvestment of part of the $17,000, and for the purpose of compelling the executrices to account, without questioning the sufficiency of the appropriation. I am satisfied that when he did these acts he was groping in the dark, not alive to the full knowledge that the appropriation was in fact insufficient, or that he might compel the residuary legatees to supplement it, or aware of the processes by which he might attain that end. That which he did was done ignorantly and without prejudice to others. It appears to me to be needless to cite authorities to show that, under such circumstances, his acts do not estop him from now claiming his rights under his father's will.

By these considerations I am convinced, not only that the appropriation by the executrices was not, by the terms of the will, final, if it can be said to have been justly made, but also that it was not rightly made or irrevocably ratified or acquiesced in.

It is not now necessary to consider the question raised as to the abatement of the annuity with the other legacies, for it does not appear that the estate is insufficient to pay the legacies in full in the manner directed by the testator. If there should hereafter be a question as to abatement, the testator's daughter Isabella and her children must be made parties to the suit, for Isabella is interested in any reduction of the *corpus* of the fund to be appropriated for the payment of the annuity, and she and her children are interested in the $15,000 of which she is entitled to the income for her life. Besides, if there should be an abatement, so that the appropriated fund will not pay the annuity, the question will arise, whether the annuity shall be paid out of the *corpus* of the fund, and in that question also Isabella will be interested.

An account must be taken of the condition of the investments already made for the annuity, and of the extent and value of the testator's real estate and of the proceeds of sale of any part or parts of it that may have been sold.